## HARRIAGE *v.* DALEY.

Opinion delivered November 15, 1915.

1.  CORPORATIONS—SERVICES—STOCK.—Under art. 12, sec. 8, Const. 1874, authority is given a corporation to issue stock in payment for services rendered it.

2.  CORPORATIONS—STOCK—VALIDITY—BURDEN OF PROOF.—The burden is upon the party asserting it, to prove that a corporation has issued stock, which is *prima facie* properly issued, without authority.

3. FRAUD AND DECEIT—FUTURE PROMISES.—A statement by A. that he
intended doing a certain thing at some time in the future, although
made with intent to deceive, will not, even if relied upon, form the
basis of an action for fraud and deceit.

Appeal from Sebastian Chancery Court, Greenwood
District; *J. F. Read,* Special Chancellor; affirmed.

### STATEMENT BY THE COURT.

This suit was instituted by appellant against the
appellees to recover $5,050, alleged to be due on the pur-
chase price of 270 acres of land sold by appellant to ap-
pellees. Appellant alleged that he sold the lands (de-
scribed in his complaint) to the appellees for the sum of
$14,500; that he was induced to accept as a part of the
purchase money 202 shares of stock of the face value of
$5,050 in the Hackett City Coal & Manufacturing Co.,
(hereinafter, for convenience, called the Coal Company);
that these shares of stock were falsely and fraudulently
issued by Daley, president, and Harrison, secretary, of
the Coal Company, without authority of the corporation,
and without any consideration paid by them to the cor-
poration for the stock; that Daley and Harrison falsely
and fraudulently represented that they were authorized
to issue the stock and that the lands purchased by them
of appellant were to be held by them for the Coal Com-
pany and developed by it; that appellant relied upon these
representations, and had a right to rely upon the same;
that said representations were false and fraudulent; that
appellees Pigg and Grayson had knowledge of the above
representations and participated in the fraud that was
practiced on the appellant; that the company was in-
solvent and the stock worthless; that the consideration
failed to the extent of $5,050; that the appellant was de-
ceived by the above false and fraudulent representations
to his damage in the sum of $5,050, the face value of the
stock, for which he prayed judgment and for a lien on
the land to satisfy the same.

Appellees Daley, Harrison and Grayson answered
denying the allegations of the complaint as to fraudulent
representations, etc., and set up that they purchased the

land of the appellant for the sum of $9,450, which they paid him; that they took the title to the lands in their own names; that they borrowed the money from a bank to pay for these lands; that when their note to the bank became due they were unable to pay the same; that appellee Pigg arranged to take care of this note, and in consideration of his paying the note which they had given to procure the purchase money they executed a deed conveying these lands and other lands to him; that all this was done with the knowledge of appellant; that the sum of $9,450 was the full value of appellant's land and all he demanded for it; that the stock mentioned by appellant in his complaint was not given as any part of the consideration for the purchase of the land and formed no inducement to the sale; that appellant knew of the speculative and uncertain value of this stock, etc. Pigg answered but the decision we have reached makes it unnecessary to set out his answer.

The appellant testified that after giving Daley and others two or three options on his land at different prices, beginning at $25 an acre, he finally sold to Daley and others the land in suit for $50 an acre, $35 in money and $15 an acre in stock of the Coal Company. He made his deed to the appellees according to their directions and it was deposited in the bank and delivered to them when the appellant received the cash and the stock. In making the contract of sale appellant dealt with Daley. Daley told him that he would give him $35 in money and $15 in stock of the Coal Company per acre; that the Coal Company would be in operation inside of 12 months; that they had sufficient stock sold to put the company in operation as soon as his deed was executed. He knew nothing about the corporation, or the value of the stock, or of the stockholders, except what Daley told him. He accepted the stock at face value: he thought it was worth it. Witness understood from them that they were operators and not speculators; that they were the Coal Company, or a part of it, and that the company was to operate the land. Before the deal was closed Pigg told witness that he was going to join Daley and others in their deal;

that he called to see the land. Witness went with Pigg to the land and when they had got only a little way out in the field Pigg said there was not any need to go further, that it looked good to him. A few days after that the deed was prepared and delivered. There was no one present except witness and Daley at the time Daley made the proposition to pay $35 per acre in cash and $15 in stock. Witness relied altogether on their statements as to the formation of the Coal Company, its officers, assets, and liabilities; that was all he had to rely upon. The value of the stock was to be its face value of $5,050, and witness got this information from their statements to him. He understood from them that the lands were to be held by the Coal Company for its use and benefit. It was sometime after the deal was made that he learned to the contrary. The men to whom the deed was made never did operate the land, nor attempt to do so. The first information witness got that they were not operating the land was quite awhile after the deed was made. Witness never talked much to Pigg about it, but he got satisfactory information from others that Pigg was claiming the land. Witness had never received notice of any meeting of the stockholders of the Coal Company.

On cross-examination witness testified that he bought 200 acres of land for Daley and others from Porter and the Fannin heirs. It was coal land, adjoining that which witness sold them. The price he paid for this land was $25 per acre. The stock given witness was not to pay him for buying that land for them. They were to pay him 10 per cent. on the purchase price of the land for buying it for them, but they never did pay him. When he asked Daley for it he said he didn't have the money. The stock was delivered to witness by Daley, Harrison or an attorney, witness was not sure which, but all three were present. Witness then reiterated that the market value of his land at the time he sold it was $50 per acre.

One witness testified that when Daley and Harrison came to Hackett on their deal with Harriage that he talked with Daley about the land and Daley said they

were going to operate the land; that they had the money back of them.

The last option that appellant gave Daley and Harrison on the land before the deed was made recites as follows: "For and in consideration of the sum of $13,-450.00, of which $8,450 is good and lawful money, and $5,050 is stock in the Hackett City Coal & Manufacturing Co.," etc. The recital in the deed as to the consideration is as follows: "For and in consideration of the sum of $9,450 cash in hand paid to us by Jno. E. Daley, J. C. Harrison, Wash Pigg and Arthur T. Grayson, and the further consideration of $5,050 in the capital stock of the Hackett City Coal & Manufacturing Co., of Sebastian County, Arkansas, to be issued to the said grantor herein."

Daley, a witness on behalf of the appellee, testified substantially as follows: That in November, 1908, appellant gave witness and Harrison an option on the land in controversy for sixty days at $30 per acre. In December, 1908, the Coal Company was organized. Witness and Harrison desired to purchase lands belonging to the Fannin heirs and Porter. These lands adjoined the appellant's land. At that time appellant wanted $35 per acre for his land. Appellant said that he could get the Fannin and Porter lands for them, and they told appellant that if he could get these lands they would give him $35 an acre for his land and $5,000 stock in the coal company as commission for his services in purchasing the Fannin and Porter lands. Appellant said "he didn't want that; that he didn't consider it worth anything, but said he could get the Fannin and Porter land if we would give him 10 per cent. on it and $35 per acre for his individual land."

They finally made appellant a proposition to give him $35 an acre for his individual land and $5,000 stock in the coal company that would be just the same as commission, "and, in that way," witness stated, "we can raise enough money to buy your land, and with this stock we can raise the money and pay you." To this appellant said: "I don't want that stock; it is no good." Witness

continues: "He finally agreed to take $35 an acre and the five thousand dollars stock in the company as his commission for getting the Fannin and Porter lands." Witness then goes into detail showing the transaction by which they borrowed the money from the bank, as set up in their answer, substantially detailing the facts as therein alleged. Witness, further along in his testimony, stated that appellant knew when they were negotiating with him for the purchase of his land that witness and Harrison had just organized the coal company. When the negotiations first began he knew that they didn't have any company. Witness made no representations as to the value of the stock because at that time the stock had no value. He denied telling the appellant that he had sold sufficient stock in the corporation to take over his land and begin the operation of the coal company. He told appellant that it was his intention to sell sufficient stock, if they could, to take over the land. The purpose of the organization of the coal company was to purchase coal properties and to start in the coal operation. Witness stated that in their negotiations with appellant $50 an acre, $15 being in stock, was never mentioned. Witness was asked by what authority he and Harrison gave $5,050 stock, and answered that Harrison owned the stock himself; that it was given to him for money he had spent in making trips to St. Louis and Chicago trying to interest others in the purchase of stock. The company was not interested in any way whatever in this $5,050 stock given to appellant.

Harrison testified that he first secured an option on appellant's land at $25 an acre, and renewed that for $30 an acre, and then optioned it at $35 an acre, and later bought it at $35 an acre, the land being deeded to the parties named in the deed. They took Pigg into the transaction before they bought the land to get him on the note for the purchase money, which was $15,000, as the total purchase price for appellant's land and the Fannin and Porter tracts. The sum paid to appellant was $9,-450.00. Harrison corroborates, in all essential details,

the testimony of Daley as to the transaction concerning the purchase of the land. He states: "We were to give him (appellant) $5,000 stock in the company for procuring for us the Fannin and Porter lands. We turned over to him $5,050 in stock." It was stock that witness owned individually and was cancelled and reissued to appellant. The stock was given to him the same day the money was paid him. At that time nothing was said about a commission for getting the Fannin and Porter lands, and witness never heard of any demand for 10 per cent. Nothing was said about $15 per acre in stock for the land. Witness stated that appellant said, during the negotiations in regard to the stock, that he didn't figure the stock worth anything; that he had seen coal companies organized before and they didn't always make a success, and what he wanted was money for his land. At the time they were renewing the option at the $35 price, the third option, appellant spoke about his commission, and Daley said we would agree to give him $5,000 in stock. Neither of them at that time made any representations as to the value of the stock; they didn't know the value of it.

One witness on behalf of the appellees testified that about the time appellant sold his land to the appellees he had a conversation with him in regard to it and appellant asked witness if he (witness) wanted to put his land in with appellant's when appellant was going to sell. Witness asked appellant what he was to get and appellant replied that he was to get $35 an acre.

One witness testified that he was familiar with the land in controversy, and that the fair market value of land in that vicinity was $25 an acre.

The testimony of appellee Pigg related to the transaction by which he assisted the other appellees in procuring the money to pay for the lands, and showing that the other appellees finally conveyed to him their interests to reimburse him for the money that he had paid. In our view of the case it is unnecessary to set out this testimony in detail.

The trial court handed down a written opinion, the conclusion of which is as follows: "In view of all the

testimony, the court is unable to find that the representations made by defendants were such a character as to sustain plaintiff's cause of action. It will, therefore, be ordered that plaintiff's complaint be dismissed with costs." A decree to that effect was entered, from which this appeal has been duly prosecuted.

*A. A. McDonald* and *Geo. W. Johnson,* for appellant.

1. The court's finding of facts and declaration of law are inconsistent and against the clear preponderance of the testimony. The acceptance of stock fictitiously issued as paid up stock did not extinguish or release his vendor's lien. 99 Ark. 438; 9 Wis. 463; 36 Ark. 162; 24 N. E. 355; 21 N. W. 684. It is a fraud on a vendee of stock to sell him as paid up stock that which is not fully paid up. Cook on Corp., (5 ed.), § § 40, 350; 30 Ark. 539; 98 *Id.* 44; 55 *Id.* 296.

2. The stock was fraudulently issued. Const. Art. 12, § 8. It was worthless, the same as no stock, and the vendor of the land had the right to foreclose his lien. 199 Ill. 24; 1 Miss. 255; 23 Fed. 311; 9 *Id.* 501; 41 Miss. 490.

3. The representations were fraudulent. Cook on Corp., (5 ed.), § 651; 83 Ark. 495; 107 Fed. 340.

4. Pigg was not an innocent purchaser. 37 Ark. 571; 43 *Id.* 464; 97 *Id.* 397; 103 *Id.* 425; 95 *Id.* 582.

*C. E. & H. P. Warner, Cecil R. Warner* and *Geo. H. Youmans,* for appellees.

1. The charge of fraud is without evidence to support it, and plaintiff is entitled to no relief. Fraud must be proven clearly. Stock can be issued by a corporation for services rendered. Cook on Corp., (7 ed.), p. 111, § 18; 13 Col. 534; 7 Ind. 595; 85 Atl. 213; 223 Ill. 567; 96 Miss. 355; 131 Mo. 638; Const., Art. 13, § 8; 120 U. S. 287. No representations as to the value of the stock were made. 22 S. E. 741; 21 N. J. Eq. 123; 16 Iowa, 163 95 Fed. 741; 43 Ark. 462; 151 Mass. 275; 24 N. E. 355; 21 N. W. 684; 63 Ark. 16; 45 *Id.* 492.

2. The representations were promissory in their nature and related to future intentions upon which an

action of fraud or deceipt can not be predicated. 91 Ark. 324; 69 Ind. 98; 60 N. W. 50; 107 U. S. 20; 110 Pac. 774; 24 L. R. A. (N. S.) 739; 24 S. E. 1014; 25 *Id.* 529; 92 Va. 1.

3. No damage was shown. 11 Ark 378; 12 *Id.* 296; 43 *Id.* 462; 53 *Id.* 275; 24 Atl. 604; 57 Ark. 441.

4. Pigg was an innocent purchaser. The testimony fails to show any fraud. 68 Ark. 391; 78 N. W. 356; 126 N. W. 875; 87 N. E. 613; 1 Big. on Fraud, 253; 105 N. W. 722; 29 N. Y. 250; 103 Ark. 425; 50 *Id.* 323.

*W. E. Atkinson,* also for appellees.

The charge of fraud was not proven. No actionable representations were made by defendants. No damage is shown. 4 Ark. 450; 30 *Id.* 309; 65 *Id.* 71; 57 *Id.* 441.

WOOD, J., (after stating the facts.) Appellant fails to prove the allegations of his complaint that the shares of stock "were falsely and fraudulently issued by the president and secretary of the coal company, and that the president and secretary falsely and fraudulently represented that they had the right and authority to issue said certificate of stock." The undisputed evidence shows that $500 was paid by Harrison into the corporation when it was organized, and that thereafter $5,050 of stock was issued to Harrison for services he had rendered the company; that when the deal with appellant was closed the certificate of this stock was cancelled and reissued for the same amount to appellant. Harrison, the secretary of the coal company, testified to these facts and that he had authority to issue the stock. Daley, the president, testified in substance that the stock issued to Harrison was for money spent and services rendered on behalf of the coal company.

(1) It is well settled that in the absence of prohibitory law a corporation may issue stock in payment for services rendered it. Our Constitution provides "no private corporation shall issue stock or bonds except for money or property actually received or labor done." Const. Art. 12, Sec. 8. Thus the authority to issue such stock is expressly conferred. See Cook on Corporations, p. 111, section 18; *Vineland Grapejuice Co.* v. *Chandler,* 85

Atl. 213; *Lee* v. *Cutrer,* 96 Miss. 355; *Rose Hill Cemetery Co.* v. *Dempster,* 223 Ill. 567.

(2)   There was no evidence to prove that the certificate of stock held by Harrison was illegally issued. Therefore such certificate is at least *prima facie* evidence of its valid issuance; and appellant having alleged that it was issued without authority, the burden was upon him to prove the charge. *The Sherman Center Town Co.* v. *Wm. B. Swigart,* 43 Kan. 292.

If the stock was legally issued to Harrison in payment for services rendered the coal company, as the evidence shows, then it was paid up stock, and when this stock was reissued to appellant he received all that his contract called for, even according to his own contention. Appellant does not allege or prove any misrepresentations made by Daley or Harrison as to the value of the stock.   They show that they made no such representations.   True, the trial court found that the stock was not fully paid up, and that Daley and Harrison had no power to issue the original stock, but there is no evidence on behalf of appellant to sustain these findings, and the evidence on behalf of appellees shows the contrary.   A judgment that is correct will not be reversed because the court has based its judgment upon erroneous grounds or given erroneous reasons therefor.   *Simpson* v. *Dicken,* 117 Ark. 304.

(3)   Appellant alleged that Daley and Harrison falsely represented that the lands were "to be held for and developed by the coal company, that this representation was the inducement for him to accept the stock in part consideration for the sale of his lands."   But these representations, if made, and if false and made with the intention to deceive, were promissory in character. They related to something that appellees Harrison and Daley said that they intended to do and promised to do in the future.   Such representations could not form the basis of an action for deceit and fraud. *Conoway* v. *Newman,* 91 Ark. 324; *Miller* v. *Sutliff, et al.,* 241 Ill. 521, 24 L. R. A. (N. S.) 735, and note; *Moore* v. *Barksdale,* 25 S. E. 529;

*McAllister* v. *Ind. & Cin. Rd. Co.,* 15 Ind. 11; *Watkins* v. *West Wytheville Land & Imp. Company,* 92 Va. 1.

The decree is in all things correct, and is therefore affirmed.