ABRAMSON v. FRANKS.

4-4800

Opinion delivered November 8, 1937.

972

*Lee & Moore,* for appellants.
*Hal P. Smith* and *K. T. Sutton,* for appellees.

GRIFFIN SMITH, C. J. About 1923 the First National Bank of Holly Grove was chartered. It functioned successfully under federal supervision until January 8, 1931, with Rue Abramson, one of the appellants herein, as its president and largest individual stockholder. On January 9, 1931, the bank failed to open. Its affairs were thereupon administered by John M. Riley as receiver until June 16, 1931. It then reopened under authority of the comptroller of the currency and continued to function until March, 1933, at which time President Roosevelt proclaimed a moratorium. Thereafter its business was liquidated under federal administration.

Although appellees' suits were filed against Rue Abramson, and R. Abramson & Co., Incorporated, the evidence is not sufficiently clear to distinguish between the financial interests of Rue Abramson and the appellant corporation. It is shown, however, that prior to the time the bank closed in 1931, Abramson and the corporation and the immediate members of Abramson's family owned $17,500 of the $25,000 capital stock of the bank.

During the receivership period from January 9 to June 16, 1931, Abramson took the initiative in working out plans for reorganization. He seems to have had the full co-operation of John M. Riley, for it is apparent that the receiver, after familiarizing himself with the bank's affairs, came to the conclusion that its impairment did not exceed the capital stock plus $12,500 in questionable notes, or a total of $37,500.

Stockholders of the bank, in pursuance of the plan to reorganize, submitted to a voluntary assessment equal to the face value of their stock holdings, and of this

amount so paid in appellants accounted for $17,500. In addition, they absorbed and paid to the bank $9,750 of the $12,500 in charged-off notes. Abramson testified that he made further payments of $3,000, or a total of $30,250. Other stockholders met voluntary assessments sufficient to bring the total of new money up to $37,500. In view of this showing the comptroller of the currency ordered or permitted the bank to resume business. In the meantime, and as a condition precedent to approval by the comptroller, depositors had executed written agreements to accept payment of their balances in four installments of 25 per cent. each, without interest, the first payment to be made when the bank opened, and the other installments in 6, 12 and 18 months.

Sale of the notes aggregating $12,500 was made upon order of Chancellor A. L. Hutchins, acting in consequence of a petition filed by the receiver.

Among the officers and directors of the bank who receipted the receiver for assets when the reorganization was consummated were Rue Abramson, president, and P. M. Dearing, cashier. Dearing served as conservator under the receiver, and was re-elected cashier when the rehabilitated bank resumed business.

On August 24, 1935, G. L. Franks, one of the appellees herein, filed suit against appellants, alleging that by reason of the fraudulent representations made by the appellant Rue Abramson, he had been induced to buy two shares of stock in the First National Bank of Holly Grove, such shares being of the par value of $100; also, that J. B. Johnson, who similarly purchased four shares of stock; A. B. Walls, Jr., who purchased one share; and Cornelius Archer, who purchased three shares, had, prior to the filing of suit, and for a valuable consideration, assigned to him all of their interests for damages arising out of such fraudulent transactions with Abramson. It was alleged by way of damages that each had been assessed an amount equal to the face value of the stock so held, amounting in the aggregate to $1,000, and in addition they suffered loss of the purchase price of the stock. Appellees Franks and Archer

alleged that they had borrowed the sums of $200 and $300, respectively, from Rue Abramson with which to purchase the stock, and had executed to Abramson their promissory notes at eight per cent. with the stock attached as collateral. Of the $200 so borrowed by Franks, he alleged that $57.20 had been repaid, and that a payment of $18 in interest had been made. He also had paid the assessment of $200. Archer had paid an assessment of $300, but had not. paid his note or the interest, nor is it shown that assessments levied against Johnson and Walls had been paid. Bonner paid his assessment, with interest of $18.33. He also had borrowed $1,000 from Abramson with which to purchase ten shares of stock, and had executed his note at 8 per cent. Two interest payments had been met, one for $80, and one for $160. Bonner's damages were laid at $1,258.33. With respect to each appellee, there was a prayer that the notes given Abramson be canceled. The assignments alleged to have been executed by Archer, Walls, and Johnson, in favor of Franks, were dated August 20, 1935. Bonner's complaint was filed October 26, 1935.

T. W. Bonner testified that he began doing business with the First National Bank in 1926, by borrowing $3,000; that in 1929 he borrowed $7,000, and repaid it, but when the bank failed in 1931 he owed a note of $2,000. In substance, Mr. Bonner said: "Because of my dealings with Mr. Abramson, I had implicit confidence in him, in his honesty and integrity. In the spring of 1931 he approached me on the proposition of selling me some bank stock. P. M. Dearing, cashier, also talked with me on the same subject. Mr. Abramson told me they had a new bank and wanted to get some new stockholders. They wanted me to take some stock, and said they would make me a director in the bank—said they would make a big man out of me. They made a trip over to my store at Blackton to see me about it. Mr. Abramson told me the bank had good money in it and that they could pay the depositors any time they walked up and wanted their money. They told me they were issu-

ing new stock. He did not tell me that they were going to cancel out the old stock and issue new stock. What he said was that it was a new bank and had plenty of money in it. I did not know until six months ago that a chancery court order had been issued for the purpose of rehabilitating the bank. I agreed to purchase $1,000 of stock in the new bank—the stock he wanted to sell me. I told him I didn't have any money, and he told me I didn't need any; that he would put up the money and hold the stock as security on my note. He kept the stock about six months, and one day I got it. It wasn't signed, so I signed it and sent it back to him. I have not paid the note, but did make two interest payments, one of $80 on December 19, 1931, and one of $160 on December 3, 1932. Later, when the bank failed, I was sued on a stock assessment, and paid the receiver $1,018.33, which included interest. Altogether, I paid out $1,258.33.''

The appellee, G. L. Franks, testifying in his own behalf, told of conversations with Rue Abramson, saying: ''He told me that the bank had made several thousand dollars, and that he would like to sell me a little bank stock to open up a new bank, and was going to do new business, and wanted to get new members and start a new outfit. I told him that I didn't have the money to put in the bank, that it would take all I had to carry on my business. He said, 'Don't worry about that—just give me your note and pay it when you feel like it; you can pay me eight per cent.' I told him I wasn't able to do that, and he named over several people who were going to buy some stock. He said: 'I will take your note, and any time you feel like you can't pay it off, I will take it over and cancel it.' About six months later I got notice that $16 was due in interest on the note for $200 I gave him, and I paid it. Later I got another notice, and I paid that. Then, later on, I went to him and told him I wasn't able to carry the debt, and he said 'all right,' so I thought he was supposed to cancel it like he said he would do. He went over and did something about the books and I did not think

any more about it until the bank closed and they notified me that I was one of the stockholders. I did not attend any meetings and did not qualify as a stockholder. I asked them what they meant, so he kinda laughed and said, 'That's some old stock they are trying to put off on you.' I did not receive any stock or anything from the bank. I paid the interest twice, and that's all I know about it. I signed the stub at the bank receipting for the stock certificate.''

C. Archer, one of the appellees, testified substantially as follows: ''I live seven miles southeast of Holly Grove, and did business with the First National Bank prior to 1931. I made a deal with Mr. Abramson to purchase some bank stock—it was supposed to have been stock in a new bank. I purchased $300 worth of the stock. Mr. Abramson and Mr. Dearing both talked with me about it. Mr. Abramson said they wanted a lot of small stockholders; wanted them scattered over a large area; said he didn't want the bank controlled by large stockholders. I told him I wasn't able to pay and he told me not to worry about the money, that he would lend it to me, take my note, and sell me the stock in this bank—a new bank. He told me that the officers would all be new officers, and that it would be a new bank. I gave him my note and he kept the stock as security. The note has never been presented to me, and I have not paid it. He has never made any effort to collect it. I bought the stock upon his representations, and was sued on an assessment.''

Although on direct examination Archer testified that after executing and delivering his note to Abramson no further communication on the subject was ever had, he admitted, on cross-examination, that he did receive a notice from Abramson dated December 1, 1931. It was returned to Abramson with a letter in which he said: ''This inclosed statement: I can't see how I can raise this amount at all. I will not get out of debt, and have some notes that I can't meet at all. If it will be possible, I wish you would get some one else to take this, as I can't possibly see my way out of debt.'' On January

5, 1932, in response to this letter, Abramson testified that he wrote: "I received your letter some days ago regarding the bank stock, and it will be satisfactory to carry the amount for you until a later date. All we ask is that you send us a check for the interest figured below." Archer also testified: "I told Abramson when I gave him the note that I couldn't tell about it until I saw what my crop would do. I told him if I didn't make any crop I wouldn't be able to take care of it. He said, 'That will be all right; I will take it off your hands if you can't take care of it.' He said he would get it transferred to some one else if he didn't get it [the bank] back on foot."

Testimony given by Abramson was in direct conflict with the material statements made by appellees. He denied having gone to Blackton to see Bonner; denied soliciting Bonner or either of the other appellees to purchase stock, and denied that he told either of them that the certificates sold to them represented stock in a new bank. He contended that the appellees knew, as everyone else in the neighborhood knew, that the Old First National Bank was being and had been reorganized.

J. W. Watson, now receiver for the bank, testified that he was sure that when liquidation was completed, depositors would have received 100 per cent. of the amounts due them, without interest.

It was shown by testimony, and by admissions of appellees, that with respect to deposits in the bank standing to their several credits prior to January 9, 1931, each had signed an agreement that time of payment should be extended. Franks was in the grocery business in Holly Grove, located near the bank. He stated on cross-examination that the only fraudulent representation made to him by Abramson was that it was a new bank, and Abramson wanted to take in some new members—young folks. This is also the gravamen of the charges made by Archer and Bonner. There is the added allegation by Franks that Abramson agreed, if so requested, to take the stock back and surrender the note. On the question of fraud, however, each charge is founded upon

the allegation that appellees were not familiar with the banking business; that they had no information with reference to the condition of the First National Bank; that they had known Abramson for many years; that his reputation for honesty and integrity was good; that because of his reputation and their knowledge of him as a man, they fully trusted him, to their injury.

Four separate fraudulent charges are urged by appellees, as follows:

(1) That Rue Abramson falsely represented to T. W. Bonner, G. L. Franks and C. Archer that a new bank was being organized, when as a matter of fact he merely sold them old stock, which he had owned many years, in an old institution, which had been forced to suspend business a very short time prior thereto; (2) That he falsely represented to them that there would be new officers and a "new outfit;" (3) That he falsely represented to them that the new bank had resources sufficient to pay all depositors "any time they wanted their money;" (4) That he fraudulently and deceitfully concealed from appellees that it was merely a rehabilitated bank in which he was selling them some of his old stock.

The allegation that appellant Abramson represented to appellees that there would be new officers in the bank, and that the new bank had resources sufficient to pay all depositors at any time they wanted their money, may be summarily dismissed. Abramson did not guarantee the election of new officers. The most that can be said of this statement is that it was the expression of an opinion, or a belief, as to something contemplated in the future. Furthermore, it is not in evidence that appellees suffered any injury through failure of the bank to elect new officers. That the bank closed by order of the President of the United States more than twenty months after opening, and that it was not subsequently able to function, is no proof that under a different management the unfortunate situation would have been avoided. In fact, all national banks closed in response to a similar order, irrespective of their solvency or insolvency.

Whether the Holly Grove bank, new or reorganized, had sufficient resources to pay all depositors "any time they wanted their money" is a question not now susceptible of determination. Proof cannot be supplied to show at what period, between June 16, 1931, and March 3, 1933, any particular depositor who had money in the bank on June 16, 1931, would have failed on demand to have received it, and it will not be presumed that Mr. Abramson meant, by his statement, to warrant that the bank's affairs were sufficiently liquid to permit every depositor to walk up to the cashier, row on row, and receipt for all balances.

Bonner's stock was bought July 7, 1931. Franks acquired his certificate June 15, 1931, and Archer's purchase was made August 22, 1931. With respect to the dates of the purchases made by Bonner and Archer, the bank had been opened and was in operation. Franks' certificate was acquired the day before the bank opened.

In a small community, such as Holly Grove, where personal contacts are frequent and important news makes its round or circuit by word of mouth in a comparatively short period of time, it is incredible that anyone could or would believe, after executing written agreements permitting the old First National Bank to reopen on a basis which promised repayment of deposits over a period of eighteen months, and after such bank had reopened and had become a going concern, that there were two First National Banks in Holly Grove, one in an insolvent or quasi-insolvent condition, benefiting by the indulgence of time given on the old deposits, and the other a new institution, wholly disassociated from the former organization, with new capital—an entity unto itself. Admitting that Rue Abramson did say that a new bank was being organized; allowing that he said new officers would be elected and new stockholders would appear; granting that he represented that cash resources of the new bank were sufficient to pay all depositors as demanded; still, these statements had reference to the time the bank opened for business on June 16. Appellees will be charged with notice that, with but slight

changes in personnel, the same official group continued to operate the bank, and they are bound to have known that the bank's business was done in the same building, with the same stationery and checks, just as business had been done in the past. Successively, statements were required to be published in one newspaper in the county on call of the comptroller of the currency, and condition of the bank was publicized.

After acquiring their stock, these appellees had a right to examine the bank's books, and were afforded opportunity to inform themselves as to conditions. Indeed, Bonner was made a director, and his name appears as one appointed to make an annual audit by counting the cash, listing the notes, and in other respects compiling information as to the bank's condition and subscribing to his findings. He became one of the agents of the bank whose business it was to pass upon loans, and it was his duty to be informed as to all material transactions.

The "Argus" and the Monroe County "Sun," published at Brinkley, and the "Commercial," published at Pine Bluff, contained news accounts of the bank's reorganization. Rehabilitation of the institution was referred to as "one of the outstanding pieces of bank financing of the year in Arkansas," and Abramson was praised for the work he had done. These news items stated that the bank had reopened under its old charter, and that during the first day the ratio of deposits to withdrawals was six to one in favor of deposits; also, that over a three-day period deposits exceeded withdrawals by ten to one.

Appellees testified that in spite of their acts in signing extension agreements as to their deposits; in spite of the publicity given the reorganized bank; in spite of the fact that they signed receipts for the stock certificates and reassigned the certificates to Abramson; in spite of all the acts and dealings and transactions and circumstances showing a reorganization of the old First National Bank, they still relied upon the statements made by Abramson before and near the date of open-

ing that the bank would be new, with new officers and a younger personnel.

It is possible they did not, at the time the deals were consummated, in June, 1931, fully understand the nature of the business, and their beliefs may have been that a new bank was being organized, or had been created. But after they had applied to this same bank for first payments on their deposits, and after waiting six months and receiving a second dividend, they were then charged with notice of the true situation, and should have proceeded, in a timely manner, to assert their several grievances. Yet when a presidential proclamation has intervened to affect the status of the bank; after control of its affairs has been taken from appellants by processes over which they had no control; after its stability suffered destruction because of the unfortunate instability of those to whom its resources had been loaned, these appellees will not be heard to say that they are not charged with a knowledge they must have possessed. It is a knowledge which the nature of their transactions, the situation of appellees, and their relation to the bank, must have imparted. It is a knowledge with which they will be constructively charged, even though they may now insist, after four years, that they were not conscious of it.

Although Archer's stock was purchased August 22, 1931—two months and four days after the bank had reopened as a reorganized institution—this appellee, in the complaint filed four years later by Franks on authority of the assignment of the same date, says that he knew nothing of the reorganization, and that he relied upon Abramson's representations that stock was being issued in a new bank. This allegation is contradicted by Archer's own statement that Abramson promised to take the stock back "If he didn't get it back on its feet." "It," as used by Archer, could have reference only to the bank, and such testimony shows conclusively that Archer knew, as early as January 5, 1932, that the so-called new bank was a myth.

Cross-complaints were filed by appellants against Bonner, Franks, and Archer, with prayers for judgments on the several notes. The jury found for appellees in the following sums: G. L. Franks, $258.12; T. W. Bonner, $1,120; C. Archer, $300. Verdicts on the cross-complaint were in favor of appellees. Judgments were rendered for appellees for the amounts indicated by the verdicts, and the court ordered the notes surrendered for cancellation.

The judgments are reversed on the ground that more than three years elapsed between the time the alleged frauds were discovered and the filing of the complaints.

The cause of action alleged by appellees by reason of payments made on stock assessments or liabilities thereon are dismissed. Judgment is given here against the appellee Archer on the note executed by him for $300, with interest from date. As to the appellees Bonner and Franks, the causes alleged in the cross-complaints are remanded with directions that proper credits be ascertained and given, and that upon such determination appellants have judgments for the amounts so found to be due.