GARLAND ANTHONY JR. ET UX *v.* FIRST NATIONAL BANK OF MAGNOLIA ET AL

5-4524 & 5-4525                                   431 S. W. 2d 267

Opinions delivered May 27, 1968
[Rehearing denied September 3, 1968.]

*Dickey & Dickey,* for appellants.

*Keith, Clegg & Eckert,* for appellees.

JOHN A. FOGLEMAN, Justice. These suits were originally brought to recover $100,665.65 on 10 notes of Garland (Jiggs) Anthony, Jr. dating from August 27, 1957, and to foreclose three mortgages or deeds of trust given by appellants.

After first filing a general denial, appellants admitted liability on 6 of the 10 notes, but denied liability on the remainder, among which were notes No. 65935 executed in 1958 in amount of $23,000, No. 86019 in amount of $3,980.29, and No. 87602 in amount of $2,-360.49. Appellants later admitted liability on note No. 84798 in amount of $15,321.88. Notes No. 86019 and No. 87602 were given for interest on the other two notes. In the amendment to the answer, appellants asserted as defenses: (1) lack of consideration for the original obligation; (2) a guarantee of non-liability made to Garland Anthony, Jr. by the bank acting through its president; and (3) unclean hands on the part of the bank. In the same pleading there was a cross complaint for judgment over against one W. C. Blewster in the event that appellants were found liable on the basis that a letter of guarantee over the signature of Blewster was interpreted to be his personal guarantee to Garland Anthony, Jr. rather than that of the bank. A further amendment to the answer of appellants asserted the defense of fraud and misrepresentation. This defense was based on the following allegations: that W. C. Blewster as president and agent of appellee bank misrepresented to Garland Anthony, Jr. that Anthony would not be required to repay the loan; that the note was required to assist the bank in its compliance with banking regulations and nothing more; that a letter of guarantee given by W. C. Blewster as president was further assurance that Anthony would not be called upon to repay said obligations; that Anthony relied upon these representations to his detriment and to the benefit of the bank; that the board of directors of appellee bank either ex-

pressly held out to Garland Anthony, Jr. that Blewster was acting within the scope of his authority or acquiesced in allowing said representations after it knew or had reason to know of such dealings by Blewster; that appellees occupied a superior bargaining position and influence over Anthony; and that the acts of Blewster, as the bank's president, were a breach of fiduciary responsibilities. This amendment contained a counterclaim for judgment against the bank in amount of any judgment against appellants predicated upon the execution of these notes as an accommodation to appellees.

Appellees' reply was a general and specific denial of allegations of the second amendment and counterclaim. Appellees also asserted that any guarantee to Garland Anthony, Jr. was ultra vires and denied any knowledge or acquiescence by the Board of Directors. Appellees further denied that Anthony accommodated the bank, asserting that the accommodation was for the benefit of Avalene Whitten, a sister of Garland Anthony, Jr., and her husband, Vernon. They also pleaded laches, waiver, estoppel, acquiescence and ratification on the part of Garland Anthony, Jr., based upon alleged interest payments and failure to deny liability until institution of these suits.

The chancery court gave judgment against Garland Anthony, Jr. on note No. 65935 for the principal balance with interest and attorney's fees, and judgment against Blewster in favor of appellant. It cancelled a deed of trust purportedly given by appellants on their home in Dallas County. No action was taken regarding notes No. 86019 or No. 87602. The chancellor found: that the letter of guarantee referred to in the pleadings was the personal guarantee of Blewster; that Garland Anthony, Jr. had recognized his liability from time to time by payment of interest, and never asserted that he was not liable on the note until after Blewster was dismissed as president; that the note was executed by Garland Anthony, Jr. as an accommodation for his sister and

brother-in-law as owners of Garland Anthony Lumber Company, to which credit was given for the proceeds of the note; that a guarantee of non-liability by the bank would have been ultra vires and illegal; that there was valid consideration for the note; that the defense of unclean hands was not sustained because it was not shown that any improper activities of Blewster were known or approved by the board of directors; that Garland Anthony, Jr. should not escape liability for an act which, if wrongful, was made to deceive bank examiners or other persons; and that Blewster had admitted liability to Garland Anthony, Jr.

Appellee Wilson Rogers, assistant vice president of appellee bank, was the only witness offered by appellees. He identified the note in question and stated that interest had been paid on No. 65935 to August 10, 1964, and that there had been one principal payment of $55, leaving a principal balance of $22,945.00. He said that notices for interest payments had been mailed regularly every three months to Garland Anthony, Jr. He also stated that the interest rate shown on the note had been changed from 6% to 7% with Anthony's consent. There is no question about the proceeds of this note having gone to the account of Garland Anthony Lumber Company, a concern owned by Avalene and Vernon Whitten, the sister and brother-in-law of Garland Anthony, Jr., and John Franklin Anthony, his brother.

W. C. Blewster was president and chairman of the board of directors of appellee bank from 1942 until he resigned in November 1964. Until his connection with the bank was severed, he handled all of the transactions involved in this litigation and seems to have had a rather free hand in conducting the bank's business.

Garland Anthony, Jr. had done business with the bank since 1941. While his loan account was paid in full in 1951, he seems to have had a series of business failures after that time. In all of these businesses he in-

curred debts which he liquidated by borrowing money from appellee bank. He also borrowed money for living expenses and to pay premiums on life insurance pledged to appellee bank as security. He mortgaged timber lands of the value of $82,000 to secure these debts. The notes on which he admitted liability constituted a part of these debts. He was allowed by the bank to keep a supply of blank notes on hand. He usually arranged for loans over the telephone, after which he would fill in and sign a note and attach it to a draft for the loan proceeds.

Blewster solicited the account of Garland Anthony Lumber Company for the bank in 1943. He took care of its financial needs at all times and even arranged to "farm out" loans to other banks when the company had exceeded his bank's legal limits on loans. The Whittens had the utmost faith and confidence in Blewster because they knew he could get financial assistance for them whenever they needed it. This assistance was not limited to this business venture, but included a loan of money to a wholesale lumber concern in which Whitten had to be a silent partner because OPA regulations forbade his ownership in such a business. Blewster even arranged for the purchase of lumber by this concern and was paid commissions which he later refunded when financial difficulties arose. The Garland Anthony Lumber Company was permitted to incur overdrafts in substantial amounts. The Whittens had, on occasion, left blank notes in Blewster's hands to be used in case of overdrafts. Blewster carried these as "cash items" in the bank's assets rather than permitting the bank account to be overdrawn, but they are usually referred to by the parties as overdrafts.

Shortly before the execution of the note in issue, Blewster called Vernon Whitten and said something would have to be done about an accumulated overdraft of $23,000. When Whitten went to the bank to discuss the matter, Blewster said to let him work on it. This was about the time when Blewster expected bank exam-

iners, and he was doing everything he could to get all cash items and overdrafts out of the bank. There is a conflict in the testimony as to what happened from this time on. Blewster said that the matter was discussed with the Whittens several times and that they stated that they had no way in which they could pay this amount and that he suggested that they go to Garland Anthony, Jr. to see if some arrangement could be made. He testified, however, that he went to Anthony on his own. Mr. and Mrs. Whitten both say they made no request of "Jiggs" and didn't talk to him about the matter either before or after their conversations with Blewster. They said that they were not close to "Jiggs," would not have asked him to help, and did not think he would have done so if they had asked. Mrs. Whitten says that she did not authorize Blewster to contact her brother and would have objected had she known that he intended to do so. Vernon Whitten said that they did not ask Blewster to find a solution for them, insofar as going to Anthony, individually, was concerned, but that Blewster said to give him a little time and he would see what he could work out. Blewster says he feels sure that he did tell them he was going to Garland Anthony, Jr. At any rate, Blewster called Anthony. Anthony states that Blewster said, "we're in trouble" and that he felt Anthony could help. Blewster advised Anthony of the overdraft situation. Blewster says that he discussed the matter with Anthony on the basis of his borrowing $23,000 to cover the overdrafts. Anthony says that Blewster told him these items must be paid before bank examiners appeared but assured him he would not have to pay the note. He says that he agreed to sign a note only because he anticipated future dealings with the bank, he was assured he would never have to pay the note, and he felt obligated for accommodations by the bank through Blewster. He said that it was done for the express purpose of helping the bank with examiners and that there was no request to him from the partners of Garland Anthony Lumber Company. He did say that his sister expressed her appreciation in a passing

statement made sometime later.

At any rate, Garland Anthony, Jr. did execute the note and was given a guarantee or indemnity agreement. This agreement was written on the letterhead of the bank, was addressed to Anthony, and read as follows:

"Regarding the matter of a $23,000.00 loan to this Bank for the benefit of Garland Anthony Lumber Company, I wish to personally guarantee this loan in the full amount.

Very truly yours,
/s/ W. C. Blewster
President"

Blewster testified that he told Anthony that efforts were being made to get a Small Business Administration loan for the Garland Anthony Lumber Company and that he thought this note would be only a temporary loan which would be paid out of the proceeds of the SBA loan. Anthony testified that Blewster guaranteed him he would never have to pay the note. He claims that he was assured that his signing this note would result in a substantial favor to the bank.

Blewster advised the Whittens of the result of his conversation with Anthony. Whitten says that when Blewster called, he asked that he and his wife come over. When they did, Blewster reported that he had worked the matter out for them. He filled out a note for them to sign and said he had to go to "Jiggs" on this. He first testified that they signed a note to "Jiggs" for $23,000, but later he was uncertain as to whether Anthony or the bank was the payee of the note. Mrs. Whitten said that Blewster stated that Anthony had done this as a favor to the bank. She signed the note presented by Blewster without looking to see who the payee was. Vernon Whitten said that Blewster said that "we gave Jiggs a letter of guarantee" and that Anthony

would not have to pay, without any suggestion that Blewster was personally guaranteeing Anthony that payment of the debt would be made. While Blewster testified that he was acting as president of the bank, his testimony leaves no doubt about his intention that the guarantee be his own personal obligation, even though he did not contemplate that the payment of the debt would be made with his own funds. Rather, he hoped that the lumber company would be able to make the payment. It was unable to do so when the SBA loan was not made. Efforts to retire this debt through a sale of the company to other owners were likewise unsuccessful. For some unexplained reason, Blewster held the Whitten note (which showed Anthony as payee when delivered) and never gave it to Garland Anthony, Jr. He delivered it to appellants' attorney only two or three weeks prior to his testimony in this case. Anthony claims that he never knew of the note.

Blewster was asked several times about the reason for getting the note from Garland Anthony, Jr. and giving the guarantee. He always emphasized getting the cash items out of the bank. He mentioned both getting the bank in condition for examination and helping the Whittens. Finally, he says that ''Jiggs'' Anthony was accommodating the Garland Anthony Lumber Company to get the cash items out of the bank and that both the lumber company and the bank were accommodated by getting the overdraft out. Anthony admitted that his sister benefited but now claims that this was only incidental to the transaction.

Notice of interest payments was sent to Garland Anthony, Jr. as they became due. Anthony admits that he made the first payment, although he claims he did so inadvertently. Later he forwarded the notices to Garland Anthony Lumber Company which made payments until the sale of the company to new owners in 1962. Garland Anthony, Jr. paid interest thereafter at the insistence of the bank. He admits having paid $4,500

on the note. He says that he did so for the same reasons he signed the note. He claims to have notified Winston Wilson, an officer and director of the bank, sometime in 1963 that this note and one in the amount of $20,000, written to cover an overdraft of another concern in which Vernon Whitten was interested, were not his obligations but those of Blewster. Wilson testified that Anthony never denied liability on the note, but merely said that one of the notes was made for the benefit of Blewster and that he had a note or letter of guarantee and that Blewster owed him part of the money. According to Wilson, this conversation took place ''after 1963 or 1964.'' An inference might well be drawn that this conversation took place after Blewster left the bank, although there is testimony from which an opposite inference might be drawn.

We are unable to say that the findings of the chancellor are clearly against the preponderance of the evidence. The conduct of Blewster, even if attributed to the bank, is not the kind of corrupt conduct justifying the denial of relief under the clean hands doctrine. The actions of Blewster in the matter were not coercive in any way, nor was Anthony under any legal duress. Representations made by Blewster were not of existing facts but of future prospects and were not such as would form the basis of fraud.

In order to sustain their defense based on the ''clean hands'' maxim, appellants refer to the actions of the bank president in manipulating and controlling notes for the bank's sole benefit without the maker's or payee's knowledge or request, in controlling customers' accounts without their knowledge or request, in signing checks on customers' accounts himself, in directing that dummy or fictitious invoices be attached to notes as security for loans, in borrowing money from customers' accounts without their knowledge or consent, and in devising means of avoiding criticism of overdrafts from bank examiners in instances not related to the obtaining of the particular note in question. It is

well settled that wrongs collateral to a complainant's cause of action may not be invoked as a defense under this maxim. The wrong must have an immediate and necessary relation to the equity complainant seeks to enforce or must affect in some manner equitable relations of the parties in respect to some matter before the court for adjudication. *Batesville Truck Line, Inc.* v. *Martin*, 219 Ark. 603, 243 S. W. 2d 729.

Appellants also argue that replacing the overdraft of Garland Anthony Lumber Company with Garland Anthony's note on which he was protected from liability by a secret agreement constituted a fraud, bringing into play the "clean hands" maxim in his favor. If this constituted a fraud, appellants were not the ones defrauded, and Garland Anthony was a party to the fraud. It is also well settled that one guilty of fraud in a transaction may not invoke the maxim as that would violate the clean hands principle. *Sliman* v. *Moore*, 198 Ark. 734, 131 S. W. 2d 1. Even if deception of bank examiners had been the only purpose of the note in question, this was as well known to Anthony as it was to Blewster, and the "clean hands" defense would not be available to him.

Appellants also contend that there was no consideration for the note, it having been given as an accommodation to the bank. As between accommodating and accommodated parties, the consideration may be shown to be wanting. *Boqua* v. *Brady*, 90 Ark. 512, 119 S. W. 677. The burden of proof was upon appellants in this regard, however. Ark. Stat. Ann. § 68-124 [Repl. 1957]; *Johnson* v. *Ankrum*, 131 Ark. 557, 199 S. W. 897; *Fisher* v. *Rice Growers Bank*, 122 Ark. 600, 184 S. W. 36. Garland Anthony, Jr. admitted that the note was given to help his sister on account of obligations she had made in excess of her credit. There can be no doubt that Garland Anthony Lumber Company received the benefit of the proceeds of the note or that Garland Anthony, Jr. knew that it would. The accommodated party was the lumber

company. The court might well have found that the Whittens authorized Blewster to make the approach to Anthony on this matter, and they certainly accepted the benefits and acknowledged their obligation to him by executing their note, even though it was not delivered to him. The accommodation of these parties constituted valid consideration for the note signed by Anthony.

Anthony sought to establish a pattern of dealing for the benefit of the bank in this manner by testifying of another such transaction which culminated in the execution of note No. 84789 by him. Oddly, he admits liability on this very note. This transaction involved an overdraft of the enterprise in which Whitten was a silent partner. While Anthony says he executed a note for $20,000 without knowing who was involved, he received in return a note of this concern signed by the known partner for the same amount with W. C. Blewster's personal endorsement thereon. His admission of liability on the note which replaced his original note lends support to the chancellor's findings rather than to appellants' position.

In *Fisher* v. *Rice Growers Bank, supra,* this court affirmed the judgment of a chancery court sustaining the validity of a note given by the makers in order to cover overdrafts of a friend who was an officer of the payee bank. There it was said that the signing of the notes was not an accommodation merely to the bank, but was in order to help a friend out of a difficulty. We cannot say that the chancellor's finding on this point is clearly against the preponderance of the evidence, as the signing of the note to help a sister and brother-in-law out of a difficulty could well remove the transaction from the category of merely accommodating the bank. While appellants argue that the note was given wholly for a pre-existing debt, there is evidence that the amount of the note was deposited to the account of Garland Anthony Lumber Company and that a note or checks for less than the amount of the note sued on were charged

against this account subsequent to or at the time of the deposit. Whether the indebtedness to the bank was evidenced by the lumber company's checks or its note at the time, the obligation was surrendered in favor of the new note.

Many of appellants' contentions are based on their view that the guarantee executed by Blewster was that of the bank. While we cannot say that there was no basis for this contention, or that the letter is without ambiguity, there is evidence that both Blewster and Anthony considered this as a personal guarantee. We have pointed out evidence tending to support the contrary finding by the trial judge. It cannot be said that these findings were against the preponderance of the evidence, particularly in view of the fact that Blewster was indebted to Whitten on an accounting from a business venture. The letter of guarantee written by Blewster, unlike the letter written by the bank president in *Binghamton Trust Co. v. Auten,* 68 Ark. 299, 57 S. W. 1105, relied on by appellants, pertained only to the guarantee and not to other matters relating to the bank's participation in the transaction. (In the cited case, the bank president's fraudulent representations, not his endorsement, were charged to the bank.) Furthermore, there is evidence which would justify a finding that Blewster was acting for the Whittens in this instance.

Appellants' next point is that there was error in failing to find that the bank was barred from recovery by reason of fraud and fraudulent misrepresentations on the part of Blewster. They base this contention upon statements by Blewster that Anthony would not have to pay the note and that it would be paid out of a Small Business Administration loan and the failure of Blewster to inform him that a bank could not legally guarantee its own loan or that deceiving the bank examiners might be a violation of law. As previously pointed out, we do not feel that the trial court's finding that

the guarantee to Anthony was given by Blewster personally, rather than on behalf of the bank, is clearly against the preponderance of the evidence. An honest but erroneous expression of opinion or belief is not fraud, even though made in terms of positive personal knowledge. One making such a statement concerning a matter not susceptible of exact knowledge in good faith is not liable for its falsity. *National Life & Accident Ins. Co.* v. *Hitt,* 194 Ark. 691, 109 S. W. 2d 426. Representations that are promissory in nature or of facts that will exist in the future, though false, do not support an action for fraud. *Harriage* v. *Daley,* 121 Ark. 23, 180 S. W. 333; *Bankers' Utilities Co.* v. *Cotton Belt Savings & Trust Co.,* 152 Ark. 135, 237 S. W. 707; *Abramson* v. *Franks,* 194 Ark. 971, 109 S. W. 2d 1271. The rule just stated would not apply if Blewster had made a false promise knowing at the time it would not be kept. *Victor Broadcasting Company* v. *Mahurin,* 236 Ark. 196, 365 S. W. 2d 265. Yet, there is nothing to show that Blewster did not have absolute confidence that Garland Anthony Lumber Company would receive an SBA loan from which the note payable to Anthony, which he obtained from the Whittens, would be paid. His good faith in making this representation was indicated by his willingness to execute a personal guarantee. Appellants' contention is that the transaction violated 18 USC § 656 prohibiting misapplication of funds of the bank. But the cancellation of the overdrafts by reason of, or from the proceeds of, the Garland Anthony, Jr. note could hardly be said to make the bank's position worse or to constitute a misapplication of funds. See *Adler* v. *United States,* 182 F. 464 (1910). We find no basis here for disturbing the findings of the chancellor.

In a case such as this where the testimony is so conflicting, even to the extent that there are conflicts in different portions of the testimony of individual witnesses, the advantage of the trier of the facts in the opportunity to observe the conduct, manner and demeanor of the witness is significant. We are unwilling to

say that his findings are against the preponderance of the evidence.

Appellants argue that the court erred in not finding that appellees were estopped to assert liability on this note. While we find no support for this argument, estoppel was not pleaded and appears to be asserted for the first time on appeal.

The court failed to act on notes No. 86019 and No. 87602. It appears that they are included in judgments for interest, so they should be cancelled.

The decree is modified to cancel the notes just described, and, as modified, is affirmed.