2011 Ark. App. 594

Ronald WORLEY and Meryl Worley, Appellants

v.

CITY OF JONESBORO, Arkansas; Mary Jo Drum; Crye–Leike of Arkansas, Inc.; and Joyce Isbell, Appellees.

No. CA 10–468.

Court of Appeals of Arkansas.

Oct. 5, 2011.

Jim Lyons, Jonesboro, for appellants.

Douglas R. Kennedy, Poplar Bluff, MO, Paul D. McNeill, Dustin Heath Jones, Jonesboro, for appellees.

DOUG MARTIN, Judge.

Appellants Ronald and Meryl Worley appeal from the Craighead County Circuit Court's granting of summary judgment to appellees, Crye–Leike of Arkansas, Inc.; its agent, Joyce Isbell; and the seller, Mary Jo Drum. The Worleys argue that the trial court erred in granting summary judgment to appellees and further erred in its award of attorney's fees. The Worleys also assert that, if the trial court is reversed on its summary-judgment decision, the jury verdict against the City of Jonesboro should be vacated. On cross-appeal, appellees argue that the trial court erred in limiting their verified claims for attorney's fees. We affirm on direct and cross-appeal.

The Worleys bought a house in Jonesboro from Drum in July 2002. Drum had listed the house with Crye–Leike and Isbell. The Worleys contacted Crye–Leike and Isbell when they were looking for a house. The real-estate contract provided that Crye–Leike and Isbell were repre-senting both the seller and the buyers. The contract also contained the following "as-is" clause:

Buyer agrees to accept the Property "as is" at closing. . . .

IN THE EVENT BUYER DOES NOT MAKE THE NECESSARY RE-QUIRED INSPECTION AND DOES NOT PRESENT THE INSPECTION TO THE SELLER IN THE ALLOT-TED TEN (10) BUSINESS DAY TIME PERIOD, BUYER WAIVES ALL RIGHTS TO RE–INSPECTION AND ASSUMES COMPLETE RESPONSI-BILITY FOR ANY AND ALL FU-TURE REPAIRS AND THE CONDI-TION OF THE PROPERTY.

The contract referred to a "Seller Property Disclosure," which provides: "Seller will provide to Buyer a written disclosure about the condition of the Property which will contain information that is true and correct to the best of the Seller's knowl-edge." On the disclosure form, which was "to be completed by owner," Drum checked "yes" in response to the question: "Has there been any flooding, drainage, grading problems, or has water ever stood on the Property or under any improve-ment constructed thereon?" In the space provided on the form for further explana-tion, Drum wrote: "Some water tempo-rarily stands on back of property during heavy rain—quickly drains unless very heavy rain. . . . All questions answered to best of my knowledge."

The contract also provided:

BUYER'S DISCLAIMER OF RELI-ANCE: BUYER CERTIFIES THAT BUYER HAS PERSONALLY IN-SPECTED OR WILL PERSONALLY INSPECT, OR HAS HAD OR WILL HAVE A REPRESENTATIVE IN-SPECT, THE PROPERTY AS FULLY AS BUYER DESIRES AND IS NOT RELYING AND SHALL NOT HERE-

AFTER RELY UPON ANY WARRANTIES, REPRESENTATIONS OR STATEMENTS OF THE SELLER, LISTING AGENT FIRM, THE SELLING AGENT FIRMS, OR ANY AGENT, INDEPENDENT CONTRACTOR OR EMPLOYEE ASSOCIATED WITH THOSE ENTITIES, REGARDING THE AGE, SIZE[,] QUALITY, VALUE OR CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION ALL IMPROVEMENTS, ELECTRICAL OR MECHANICAL SYSTEMS, PLUMBING OR APPLIANCES, OTHER THAN THOSE SPECIFIED HEREIN (INCLUDING ANY WRITTEN DISCLOSURES PROVIDED BY SELLER AND DESCRIBED IN PARAGRAPH 16 OF THIS REAL ESTATE CONTRACT), IF ANY, WHETHER OR NOT AN [sic] EXISTING DEFECTS IN ANY SUCH REAL OR PERSONAL PROPERTY MAY BE REASONABLY DISCOVERABLE BY BUYER OR A REPRESENTATIVE HIRED BY BUYER. NEITHER LISTING AGENT FIRM NOR SELLING AGENT FIRM CAN GIVE LEGAL ADVICE TO BUYER OR SELLER. LISTING AGENT FIRM AND SELLING AGENT FIRM STRONGLY URGE THAT STATUS OF TITLE, PROPERTY CONDITION, QUESTIONS OR SURVEY AND ALL REQUIREMENTS OF SELLER AND BUYER HEREUNDER SHOULD EACH BE INDEPENDENTLY VERIFIED AND INVESTIGATED.

On June 16, 2005, the Worleys sued Drum, Crye–Leike, Isbell, and the City of Jonesboro, alleging that the house's garage had flooded on August 13, 2002, and at least five additional times thereafter, as a result of inadequate drainage for heavy rain. They further alleged unlawful taking by the city; misrepresentation by Drum in the "Owner Property Disclosure" form; that Isbell assisted Drum in completing the disclosure form and fraudulently failed to disclose the drainage problem in order to induce the Worleys to buy the property; and breach of fiduciary duty by Crye–Leike and Isbell. The Worleys sought damages, injunctive relief directing the city to correct the drainage problem, and costs and attorney's fees.

Crye–Leike and Isbell moved for summary judgment on March 29, 2006, asserting that they did not assist Drum in completing the disclosure form or make any representation concerning drainage to the Worleys. They pointed out language in the disclosure form providing that the statements contained therein were based on the owner's knowledge and were made by the owner, not the agents of the owner. They also attached to the motion affidavits of Isbell and Brian Robinson, senior vice-president of Crye–Leike, both averring that they did not make any representations to the Worleys regarding drainage problems; that they had no knowledge of any drainage problems other than those disclosed by Drum; and that they did not assist Drum in completing the disclosure form and were not present when she did so. Crye–Leike and Isbell also filed with the motion a copy of an appraisal of the property dated July 1, 2002, setting the property's value at $220,000, and a copy of the inspection report provided to the Worleys by Dan Melton on June 25, 2002. The inspection report noted that the site was at a "[l]ow point for area drainage." The report also recommended that fencing be placed around an open drain on the property "to prevent child falling into and being washed away."

Finally, Crye–Leike and Isbell filed with the motion a copy of the "Inspection, Repair and Survey Addendum" reflecting that the Worleys had used an inspector of

their choice and that no list of repairs was "noted at this time." This document included the Worleys' agreement to the property conditions at the time of their final walk-through prior to closing and stated in relevant part:

BUYER UNDERSTANDS THAT THE RECEIPT OF A HOME INSPECTION AND AN OWNER PROPERTY DISCLOSURE DOES NOT RELIEVE BUYER FROM THE RESPONSIBILITY OF PERSONALLY INSPECTING THE PROPERTY UNTIL THE BUYER IS FULLY SATISFIED. BUYER WARRANTS, REPRESENTS AND ACKNOWLEDGES THAT BUYER AND ALL PERSONS OR ENTITIES DESIRED BY BUYER HAVE INSPECTED THE PROPERTY TO THE FULLEST EXTENT DESIRED BY BUYER AND FIND THE CONDITION OF THE PROPERTY ACCEPTABLE IN ALL RESPECTS. BUYER REAFFIRMS ALL DISCLAIMERS SET FORTH WITHIN PARAGRAPH 25 OF THE REAL ESTATE CONTRACT BETWEEN BUYER AND SELLER. BUYER HAS HAD AN OPPORTUNITY TO INSPECT, REVIEW AND VISIT THE PROPERTY AND TO OBTAIN A BOUNDARY SURVEY OF THE PROPERTY TO DETERMINE THAT THE PROPERTY ACTUALLY CONVEYED IS THE PROPERTY THE BUYER UNDERSTANDS IS BEING CONVEYED, AND BUYER IS NOT RELYING ON ANY STATEMENT (WRITTEN OR ORAL) OF LISTING AGENT FIRM, SELLING AGENT FIRM, OR SELLER CONCERNING THE SIZE, DIMENSIONS, ACREAGE, AREA OR LOCATION OF THE PROPERTY. THE FACT THAT THE BUYER COMPLETES THE PURCHASE OF THIS PROPERTY WARRANTS THAT THE BUYER IS COMPLETELY SATISFIED WITH THE CONDITION OF THE PROPERTY.

In response to Crye–Leike and Isbell's motion for summary judgment, Ronald and Meryl Worley filed affidavits of their own. Mr. Worley's affidavit states in part:

10. That the first time we looked at the Property, I asked Defendant Isbell about drainage and she said that she did not know anything about the drainage. However, in their Brief in Support of their Motion for Summary Judgment, the Defendants admit that "they had sufficient information upon which to make a representation" concerning the drainage on the Property....

11. That Defendant Isbell told my wife and me that Defendant Drum was having trouble filling out the property disclosures and that Defendant Isbell was having to help Defendant Drum fill out the Property Disclosures.

12. That in fact, Defendant Isbell told my wife and me that she was having to "coach" Defendant Drum on what to say on the Property Disclosures.

. . . .

17. That we would not have purchased the Property if we had been informed of the true extent of the flooding or drainage problems which actually existed on the Property. Further, we would not have purchased the Property if we had been informed that the flooding or drainage problems caused water to enter the garage.

18. That the estimated material cost, without any labor, to correct the flooding or drainage problem properly is approximately $20,000.00. Further, without doing substantial work to correct the flooding or drainage problems, we cannot sell the Property without disclosing that the garage regularly floods.

Mrs. Worley's affidavit contains the same statements.

Crye–Leike and Isbell subsequently supplemented their summary-judgment motion with their answers to interrogatories and requests for production of documents, as well as those of Drum, wherein Drum stated that she "may have filled [the disclosure form] out in the presence of Joyce Isbell, but [she didn't] believe anyone helped" her. Crye–Leike and Isbell further supplemented their motion with the affidavits of real-estate agents, Bob Harrison and Bill Hester, who stated that they had previously listed the property for sale and had no knowledge of drainage problems.

Drum moved for summary judgment on October 5, 2006. She attached to the motion her affidavit, excerpts from her deposition, and the deposition of Ronald Worley. In her affidavit, Drum stated that she purchased the house with her husband and sister and moved there in December 1999; that, in 2000, she went "back and forth" between the house and her residence in Poplar Bluff, Missouri; that her sister lived at the house in Jonesboro until her death in 2000; that Drum did not live in the house for six or seven months before her husband's death on July 31, 2001; after that, she lived in Poplar Bluff or with relatives; and that she owned the house in Jonesboro for only two and one-half years.

In her deposition, Drum stated that she personally filled out the disclosure form; that she fully disclosed everything she knew about the property and answered every question to the best of her knowledge; and that, other than what she disclosed about the back yard, she had no knowledge of any drainage issues.

In his deposition, Ronald Worley testified that he had a degree in industrial electronics and was a certified master electrician, pipe fitter, and refrigeration, HVAC, and boiler mechanic; that he was employed as the manager of Engineering and Maintenance for the Nestle factory in Jonesboro; that the Worleys had purchased the home, which had been appraised for $220,000, for $190,000; that he knew that, after Drum's husband died, she was ill and depressed, lived with a relative, and did not need more than one residence to maintain; that he had the house inspected before he bought it but did not read the inspection report; that he saw the open drain at the residence and drove around the neighborhood, from which he could determine that the property was the low point in the subdivision for drainage; that he did not read the title commitment, which stated that there was a thirty-foot easement across the property for drainage purposes; that the garage had not flooded since August 4, 2004; and that he had no knowledge of any information that Drum had possessed about the drainage problem, other than what she had provided on the disclosure form.

Mr. Worley added that he was not aware that Drum had taken any action to conceal the drainage problem; that, other than what Drum had revealed on the disclosure form, he had no knowledge whether the property had ever flooded before he purchased it; that he had not been informed that the drain on the property carried enough water to create a potentially life-threatening situation; that he did not receive the inspection report, discussing the danger presented by the drain, until the day before closing and thereafter did not read it; and that he had known that he had the right to halt the closing if he found anything in the inspection report that caused him concern.

The Worleys thereafter responded to Drum's summary-judgment motion. In support of their response, the Worleys filed more excerpts from Drum's deposi-

tion in which she stated that she did not recall if there were problems with water overflowing the ditch but that she had known that there had been water across the back and side lines; that she had known that water had come from behind a neighbor's house and Wal–Mart and had risen as high as the sidewalk, i.e., within five feet of the house, at the back of the house; that her husband had spoken with city officials;[1] that she had spoken with neighbors about the drainage problem on several occasions; that her husband had pushed down trees on the property;[2] and that, on one occasion, the water had risen so high that people took pictures of it.

The trial court heard Crye–Leike and Isbell's motion for summary judgment on October 17, 2006, and reserved ruling on the motion pending a hearing on Drum's motion for summary judgment. On November 9, 2006, a hearing was held on Drum's motion, and Crye–Leike and Isbell's motion was taken up again. The trial court granted the motions for summary judgment at the conclusion of the hearing and directed the parties to file supplemental pleadings on the issue of attorney's fees.[3]

Drum subsequently moved for attorney's fees on December 7, 2006, citing paragraph 28 of the real-estate contract, which states that, if buyers or seller should initiate any type of proceeding or litigation against the other or against an agent, "all prevailing parties shall be entitled to an award of their respective attorney's fees and costs incurred in defense of such initiated action against the non-prevailing party." Likewise, Crye–Leike and Isbell moved for attorney's fees on December 19, 2006, also basing their motion on paragraph 28 of the contract.

At a hearing on June 26, 2007, the trial judge ruled that the contract authorized an award of attorney's fees and that he had the power to determine what was reasonable. The trial court awarded attorney's fees to Drum and to Crye–Leike and Isbell; however, the court found the amounts requested to be unreasonable and awarded amounts lower than those which the parties had sought.[4]

On January 4, 2008, appellees filed a joint motion for supplemental attorney's fees, stating that the Worleys had filed an appeal, which the court of appeals had dismissed for lack of a final order on November 29, 2007. Drum sought $1,298.96 and filed an affidavit and time-and-expense report of her attorney, while Crye–Leike and Isbell sought $3,307.54 and filed their attorney's affidavit and a redacted time-and-expense report showing dates and hours worked. The Worleys again responded that no fees were justified and that the fees requested by appellees were excessive.

---

1.  The parties disagreed as to whether Drum had indicated that her husband's discussion was about the drainage issue.

2.  The Worleys argued that Drum had told them that the trees were to act as a dam to keep water from Wal–Mart off the property; however, Drum contended that her husband had pushed the trees back to get them out of the way so other things could be placed there. The parties also disagreed about whether Drum's husband had purchased a tractor for the purpose of solving the drainage issue.

3.  The court's written order granting summary judgment was not entered of record until December 12, 2006.

4.  The motions for attorney's fees and the trial court's rulings thereon are discussed more fully in the portion of this opinion below addressing the Worleys' appeal and Crye–Leike and Isbell's cross-appeal regarding attorney's fees.

The remaining claims against the City of Jonesboro went to trial on September 14 and 15, 2009. The jury returned a verdict for the Worleys and awarded · them $15,000; however, the trial court denied the Worleys' claim for injunctive relief on December 8, 2009. The trial court entered judgment on the jury's verdict on January 14, 2010.

The Worleys filed a timely notice of appeal from the order granting summary judgment to Drum, Crye–Leike, and Isbell; the order awarding attorney's fees to Drum, Crye–Leike, and Isbell; the judgment entered on the jury verdict; and the trial court's order denying injunctive relief. Crye–Leike and Isbell filed timely notices of cross-appeal from the orders awarding attorney's fees, as did Drum.[5]

I. *Summary Judgment—Direct Appeal*

The Worleys argue that the trial court erred in granting summary judgment to appellees. Summary judgment may be granted by a trial court only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, clearly show that there are no genuine issues of material fact to be litigated and the party is entitled to judgment as a matter of law. *Bisbee v. Decatur State Bank*, 2010 Ark. App. 459, 376 S.W.3d 505. When the movant makes a prima facie showing of entitlement to summary judgment, the respondent must meet proof with proof by showing a genuine issue as to a material fact. *Id.* When a party cannot present proof on an essential element of a claim, the party moving for summary judgment is entitled to judgment as a matter of law. *Caplener v. Bluebonnet Milling Co.*, 322 Ark. 751, 911 S.W.2d 586 (1995). On appeal, this court need only decide if summary judgment was appropriate based on whether the evidentia-ry items presented by the moving party in support of the motion left a material question of fact unanswered. *Bisbee, supra.* In making this decision, this court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* When there are genuine questions of material fact with regard to a party's intent, summary judgment is improper. *Id.* Summary judgment should be denied if reasonable minds might reach different conclusions from the undisputed facts. *NCCF Support, Inc. v. Harris McHaney Real Estate Co.*, 2010 Ark. App. 384, 376 S.W.3d 459.

The Worleys contend that they submitted proof of all elements of constructive fraud, which are (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Gorman v. Gilliam*, 2010 Ark. App. 118, 374 S.W.3d 117. A person may commit fraud even in the absence of intent to deceive. With constructive fraud, liability is based on representations that are made by one who, not knowing whether they are true or not, asserts them to be true. *Beatty v. Haggard*, 87 Ark.App. 75, 184 S.W.3d 479 (2004). Constructive fraud has been defined as a breach of a legal or equitable duty, which, irrespective of the moral guilt of the fraud feasor, the law declares to be fraudulent because of its tendency to deceive others; constructive fraud generally involves a mere mistake of fact. *Id.* Thus, neither actual dishonesty of purpose nor intent to deceive is an essential element of

---

5. The City of Jonesboro did not appeal from the jury verdict against it.

constructive fraud, and a party's lack of knowledge of the material representations asserted by him to be true or his good faith in making the representations is no defense to liability. *Id.*

Constructive fraud can occur where a seller made a misrepresentation, even though he did not know that he was making a misrepresentation, and even though he made the representation in good faith; the key was that the buyer relied to his detriment on statements ⌐₁₃that proved to be untrue. *Lane v. Rachel,* 239 Ark. 400, 389 S.W.2d 621 (1965); *see also Knox v. Chambers,* 8 Ark.App. 336, 654 S.W.2d 582 (1983). Nondisclosure may provide a basis for a claim of constructive fraud, but, generally, liability for a nondisclosure may be found only in special circumstances, where there is a duty to communicate the purportedly concealed material fact or where one party knows another is relying on misinformation to his detriment. *See Gorman, supra; Downum v. Downum,* 101 Ark.App. 243, 274 S.W.3d 349 (2008).

The Worleys argue that Drum made fraudulent statements in her disclosure form, either knowing that the statements were false or not knowing them to be true, and asserted them to be true, and that Drum knew substantially more about the drainage problems than she indicated on the disclosure form. The Worleys recount Drum's deposition testimony at length and focus on Drum's statements that her husband pushed down trees, which the Worleys argue was done to make a dam to stem the flow of water; that Mr. Drum bought a tractor, which the Worleys argue was for the purpose of correcting the drainage problems; and that he talked to city officials about the drainage problems. The parties' contract reflects, however, that the Worleys disclaimed reliance upon any of Drum's representations.

Moreover, the Worleys relied upon their own inspection of the property; however, they argue that their employment of an inspector to inspect the property before closing did not necessarily, as a matter of law, prevent them from establishing that they justifiably relied on Drum's purported misrepresentations. *Fausett & Co. v. Bullard,* 217 Ark. 176, 229 S.W.2d 490 (1950). Also, the Worleys agreed to accept the property "as is," but again they maintain that ⌐₁₄this clause as well did not prevent the Worleys from proving justifiable reliance upon Drum's purported misrepresentations.

In *Beatty, supra,* this court held that neither an "as-is" clause nor a buyer's disclaimer of reliance barred a purchaser's action for rescission of a real-estate contract based on constructive fraud. In that case, the sellers' disclosure form indicated that there had been no structural modifications or settling. The buyers later discovered that there had been settling and that the sellers had poured concrete at one corner of the home to stop it. Mr. Haggard, a seller, was an experienced builder, and the sellers' son, also a builder, built the house. Further, the buyers had a home inspector inspect the house before the sale, and he testified that he was not aware of the additional concrete and that, if he had been aware of it, he would have included it in his report and recommended that the buyers have a structural engineer look at the house. The trial court held that the buyers failed to prove fraud. This court reversed, however, holding that an "as-is" clause does not bar a claim for fraud. *Beatty,* 87 Ark.App. at 87, 184 S.W.3d at 487. This court noted that the "Buyer's Disclaimer of Reliance" excluded from its terms, "written disclosures provided by the seller," as does the contract in the case at bar. There was, however, no discussion in *Beatty* of a buyer's statement similar to the Worleys' statement in the

"Inspection, Repair and Survey Addendum" that they found the condition of the property acceptable in all respects and, by completing the purchase, warranted that they were completely satisfied with the property.

In *Barringer v. Hall,* 89 Ark.App. 293, 202 S.W.3d 568 (2005), this court affirmed a jury verdict for the sellers in a case brought by the buyers for damages for fraud and breach of contract. The sellers' disclosure form had stated that the property was served by an individual septic system to the best of the owners' knowledge; in fact, the house's sewage ran through a pipe to the side of a mountain approximately 250 feet away, where it emptied into a ravine. The contract contained an "as-is" clause and a "Buyer's Disclaimer of Reliance," and the buyers signed an "Inspection, Repair, and Survey Addendum" before closing indicating that they found the condition of the property acceptable in all respects and, by completing the purchase, warranted that they were completely satisfied with the property. The jury found that the buyers had proved none of the elements of fraud. This court agreed and distinguished the case from *Beatty:*

> With regard to the fourth element of justifiable reliance, appellants argue that the jury's answer of "No" was not supported by substantial evidence. They contend that their justifiable reliance could not have been negated by the real estate contract's "as-is" clause or any other contractual disclaimers. In support of their argument, they cite our recent case of *Beatty v. Haggard,* 87 Ark.App. 75, 184 S.W.3d 479 (2004), in which we held that neither an "as-is" clause nor a Buyer's Disclaimer of Reliance similar to the one in this case barred a home buyer's action for fraud. However, *Beatty* is distinguishable from the case at bar.

In *Beatty,* the sellers of the home represented in a disclosure statement that there had been no structural modifications or other alterations or repairs made to the property and that there had been no settling from any cause. After purchasing the home, the buyers noticed evidence of settling and discovered that the sellers had poured additional concrete along one corner of the home, which the buyers characterized as an attempt to stop the settling. The additional concrete was covered with dirt and grass and was not visible at the time of the purchase to either the buyers or their inspector; nor were the buyers told about the additional concrete. The buyers sued the sellers to rescind the contract for fraud.

The trial court held that the buyers failed to prove fraud, but this court reversed and in doing so discussed, among other things, whether the buyers reasonably relied on the sellers' misrepresentation, given that the parties' contract contained an "as-is" clause and a disclaimer similar to the Buyer's Disclaimer of Reliance in this case. In discussing the "as-is" clause, we held that, while the sale of property "as is" generally relieves a vendor from liability for defects, unless the defects are patent, an "as-is" clause does not bar an action by the vendee based on claims of fraud or misrepresentation. We also held that the Buyer's Disclaimer of Reliance excluded from its terms "written disclosures provided by the seller." However, there is no indication that the buyers in *Beatty* signed a disclaimer such as the one contained in the Inspection, Repair and Survey Addendum in the case at bar. That disclaimer provided that the buyers found the condition of the property acceptable in all respects and, by completing the purchase, warranted that they were completely satisfied with the

property. Further, *Beatty* did not discuss the effect of language in the owner disclosure form that representations were made to the best of the owners' knowledge; that the owner had no expertise in certain areas; and that the disclosure form was not a substitute for an inspection. We also observe that *Beatty* involved a *de novo* review for clear error while, in the present case, our task is to determine whether there was substantial evidence to support the jury's verdict.

In light of the above factors distinguishing *Beatty*, we agree with the trial court that the jury could have found a lack of justifiable reliance based on appellants' inspection of the property and on the disclaimers and other portions of the sale documents. Therefore, we cannot say that the jury's finding on this element of fraud was not supported by substantial evidence.

89 Ark.App. at 302–04, 202 S.W.3d at 574–75.

In *Thomas v. Olson,* 364 Ark. 444, 220 S.W.3d 627 (2005), the supreme court affirmed a jury verdict for the sellers of a house with foundation problems. The sellers checked "yes" to questions on a property-disclosure form that indicated that their house had experienced settling problems, causing defects in the structure; the contract contained an "as-is" clause; the sellers' neighbor, a coworker of the buyer, informed the buyer that the house was being sold at a reduced price because it had foundation problems; and the buyer admitted that she was aware that one of the reasons for the reduced price was the settlement problems.

In the instant case, the Worleys failed to demonstrate that Drum made any false statements on the disclosure form or that she knew of drainage problems that were worse than she had disclosed. In her deposition, Drum testified that the water had never gotten on the sidewalk in the back of the house, in the garage, or close to the sides of the house. Moreover, Ronald Worley admitted in his deposition that he had no evidence that the property had flooded and no evidence that Drum had concealed any drainage problems.

In any event, the Worleys' reliance on any purported misrepresentations by Drum was not justifiable. Ronald Worley admitted that he did not read the inspection report, which noted the property's location at the low point for area drainage and the potentially dangerous drain in the yard. Summary judgment was appropriate as to this claim against Drum, as there are no genuine issues of material fact to be litigated. We affirm on this point.

With respect to the claims for fraud and breach of fiduciary duty against Crye–Leike and Isbell, the Worleys primarily supported their claims with their own statements in sworn affidavits. A broker, like any other agent, owes his principal the utmost good faith and loyalty. *Toney v. Haskins,* 7 Ark.App. 98, 644 S.W.2d 622 (1983). A fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. *Cole v. Laws,* 349 Ark. 177, 76 S.W.3d 878 (2002), *cert. denied,* 537 U.S. 1003, 123 S.Ct. 509, 154 L.Ed.2d 400 (2002). The Worleys argue on appeal that the evidence demonstrated that Isbell assisted Drum in completing the disclosure form and that Crye–Leike and Isbell had information that Drum's property had drainage problems. Even if Isbell did assist Drum in completing the disclosure form, the Worleys offered no proof that Isbell, and therefore, Crye–Leike, had any more information about the drainage problems than Drum indicated on the disclosure form. Because there are no genuine issues of material fact to be liti-

gated, we affirm the trial court's granting of summary judgment as to the claims against Crye–Leike and Isbell.

## II. *Attorney's Fees—Direct and Cross-Appeal*

On direct appeal, the Worleys challenge the trial court's decision to award attorney's fees and the reasonableness of the awards. Arkansas allows a prevailing party in a breach-of-contract case to recover reasonable attorney's fees. Ark.Code Ann. § 16–22–308 (Repl.1999). A trial court, however, is not required to award attorney's fees under this statute, and any amounts awarded are discretionary. *Conway Comm. Warehousing, LLC v. FedEx Freight E., Inc.*, 2011 Ark. App. 51, 381 S.W.3d 94.

Even if attorney's fees are not awarded under section 16–22–308, they may still be due under the language of a contract. When the parties enter into a written contract that specifically provides for the payment of attorney's fees incurred in the enforcement of the contract, the agreement is enforceable according to its terms, independent of section 16–22–308. *Marcum v. Wengert*, 344 Ark. 153, 40 S.W.3d 230 (2001). The use of the word "shall" in the attorney's fee section of a contract requires a mandatory award of attorney's fees to the prevailing party. *Id.*

As mentioned above, Drum, Crye–Leike, and Isbell relied on paragraph 28 of the parties' contract. Paragraph 28 provides:

> ATTORNEY'S FEES: Should Buyer or Seller initiate any type of administrative proceeding, arbitration, mediation or litigation against the other (or against an agent for the initiating party or agent for the non-initiating party), it is agreed by Buyer and Seller ... that all prevailing parties *shall* be entitled to an award of their respective attorney's fees and

costs incurred in defense of such initiated action against the non-prevailing party.

(Emphasis added.)

Given the plain language of the contract mandating an award of attorney's fees, the trial court did not err in awarding attorney's fees to appellees as the prevailing parties. We affirm on this point with respect to the Worleys' direct appeal.

Drum's motion for attorney's fees, which was accompanied by a detailed accounting of counsel's time and expenses, sought $12,805.08. Crye–Leike and Isbell's motion, which was also accompanied by supporting documentation, sought $14,623.06. As mentioned above, however, the trial court found these amounts to be "unreasonable," and it thus awarded $6,000 each to Drum's attorney and Crye–Leike and Isbell's attorneys.

On cross-appeal, appellees assert that the contract did not restrict fees to only those that were reasonable and that the trial court erred in reading the limitation of "reasonable" into the provision. In *Griffin v. First National Bank of Crossett*, 318 Ark. 848, 888 S.W.2d 306 (1994), which involved a guaranty in which the appellant had agreed to pay all expenses, including attorney's fees paid or incurred by the bank in collecting the debt and enforcing the guaranty, the supreme court stated that, implicit in its holding, was a requirement that any attorney's-fees award be reasonable. In *Phi Kappa Tau Housing Corp. v. Wengert*, 350 Ark. 335, 339–40, 86 S.W.3d 856, 859 (2002), however, the supreme court stated that it would not substitute the word "reasonable" for the word "all" in a contract that provided for the payment of "all costs incurred...." Appellees urge this court to follow *Phi Kappa Tau*; however, that case is distinguishable. Whereas the guaranty in *Phi Kappa Tau*

referred to "all attorney's fees," the contract here simply calls for "respective attorney's fees." The trial court did not err in limiting appellees' respective attorney's fees to that which was reasonable. Accordingly, we affirm on cross-appeal.

■ As to the amounts awarded, we note that, although there is no fixed formula in determining what constitutes a reasonable attorney's fee, a trial court should be guided by certain factors in considering a fee request, including the experience and ability of counsel; the time and labor required to perform the legal services properly; the amount involved in the case and the results obtained; the fees customarily charged; whether the fee is fixed or contingent; the time limitations imposed upon the client in the circumstances; and the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. *Phi Kappa Tau, supra; Chrisco v. Sun Indus.*, 304 Ark. 227, 800 S.W.2d 717 (1990). Due to the trial court's intimate acquaintance with the record and the quality of service rendered, this court typically recognizes the superior perspective of the trial court in assessing the applicable factors. *Id.*

The Worleys argue on direct appeal that the fees awarded were unreasonably high. Given the trial court's superior perspective in assessing the applicable factors in its determination of what constitutes a reasonable amount of attorney's fees, we find no error in the trial court's decision and note that the awards were far less than what appellees requested. Therefore, we affirm the awards.

III. *Jury Verdict Against the City of Jonesboro—Direct Appeal*

Without citing any case that supports their position, the Worleys argue that, if this court reverses the summary judgment in favor of appellees, it should also vacate the judgment entered on the verdict against the City of Jonesboro. Because we affirm the trial court's granting of summary judgment to appellees, we need not address this point.

Affirmed on direct appeal; affirmed on cross-appeal.

WYNNE and HOOFMAN, JJ., agree.