

Cite as 2014 Ark. App. 101

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-12-450

| | |
|---|---|
| GEORGE HOBSON and MONTIE HOBSON<br><br>APPELLANTS<br><br>V.<br><br><br>ENTERGY ARKANSAS, INC.<br>APPELLEE | **Opinion Delivered** February 12, 2014<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTH DIVISION<br>[NO. 60CV-06-10641]<br><br>HONORABLE TIMOTHY DAVIS FOX, JUDGE<br><br>AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

## DAVID M. GLOVER, Judge

This appeal arises from a suit filed by appellants George and Montie Hobson against appellee Entergy Arkansas for actual and constructive fraud, breach of contract, and promissory estoppel. The suit claimed that Entergy failed to honor its promise to purchase the Hobsons' home in connection with a job relocation.[1] Prior to trial, the circuit court entered three summary-judgment orders that are pertinent to this appeal. The first order dismissed the Hobsons' claims for actual and constructive fraud. The second and third orders limited the types of damages the Hobsons could recover on their remaining claims for breach of contract and promissory estoppel. Those two claims went to trial, and the jury awarded the Hobsons $21,935.95. For reversal, the Hobsons argue that the circuit court erred in entering each of

---

[1]We previously ordered rebriefing in this case. *Hobson v. Entergy Arkansas, Inc.*, 2013 Ark. App. 447.




the summary-judgment orders. We affirm in part and reverse and remand in part.

## I. *Factual Background*

In 2000, appellant George Hobson was living in Rogers, Arkansas, with his family. He operated an electrical-contracting business, kV Electric, Inc., and his wife, appellant Montie Hobson, worked as an accountant for St. Mary's Hospital. Before operating his own business, Mr. Hobson was employed at Entergy for over twenty years.

In the summer of 2000, Jerry Tanner of Entergy approached Hobson with an offer to return to work for Entergy in central Arkansas. Hobson told Tanner that he could not consider the offer unless Entergy gave him his time back for seniority and vacation purposes and bought his house in Rogers and moved him to central Arkansas. According to Hobson, Tanner told him that this would be "no problem" but that, if he took the job, he would have to sell his interest in kV Electric to avoid a conflict of interest. Tanner would later testify that he was aware of Entergy's employee-relocation policy and believed that Hobson would qualify for the policy's benefits. There is no evidence, however, that Tanner provided Hobson with a copy of the relocation policy or discussed its provisions in detail.

Entergy's written employee-relocation policy, as effective in the year 2000, is not in the record before us. However, other documents of record indicate that the policy applied to Entergy employees and new hires with a Responsibility Level of 21 or higher. The 2003 relocation policy, which is in the record, includes "home sale and home purchase benefits" under a Third Party Purchase Program. The program provides that a company called Cendant Mobility Services Corporation will establish the appraised value of the employee's home, then

deliver a sales contract to the employee, who has ninety days to elect to sell the home to Cendant.

In July 2000, Hobson accepted the job with Entergy and began working there almost immediately. He stayed in Little Rock at Entergy's expense while Mrs. Hobson and the children remained in Rogers, pending the sale of the house. As required by Entergy, Hobson made arrangements to sell his interest in kV Electric. Mrs. Hobson quit her job to prepare the Rogers house for sale.

A short time later, a conflict arose as to whether Mr. Hobson qualified for the home-buyout benefit. According to notes prepared by Cendant, Hobson had been hired at a responsibility level of 17 and was not eligible for the home-buyout package. The notes also reflect that the Hobsons complained to Cendant that Entergy's purchase of their home was part of Mr. Hobson's agreement to accept employment with Entergy. After several email communications, Entergy and Cendant apparently concluded that Tanner had misunderstood the policy's provisions and had in fact offered Hobson the home-buyout benefit. Tanner asked Cendant to appraise the Hobsons' house and proceed with a buyout. The house, which the Hobsons had been trying to sell on their own for $279,000, appraised for $245,000. According to Cendant, the house was overpriced and needed certain improvements.

The Hobsons incurred expenses in making repairs and improvements to their home. Nevertheless, Entergy and Cendant decided in December 2001 not to buy the home.

Thereafter, the Hobsons continued to try and sell their home on the open market while simultaneously urging Entergy executives to honor the company's promise to buy the

SLIP OPINION

home. At one point, they pled their case to Entergy's CEO, Wayne Leonard, who sympathized with their situation and acknowledged Entergy's possible legal exposure.

In June 2003, Mr. Hobson received a letter from Entergy executive Doug Mader, stating that "the decision has been reached to provide you home buyout benefits." The letter further stated that, in accordance with Entergy's relocation policy, an appraisal would be done on the Rogers home and "an appraised value offer will be extended to you."

The Hobsons believed that Entergy's decision to provide "home buyout benefits" meant that Entergy would at last fulfill its promise to buy their home. In August 2003, they received a contract of sale from Cendant. The contract named the Hobsons as sellers; named a Cendant subsidiary, Cendant Mobility Financial Corporation, as the buyer; stated an agreement to buy the home for $245,000 "based upon your employer's relocation policy and an average of independent appraisals"; stated that the Hobsons would give Cendant Financial full possession as "the new owner" within sixty days after signing the sales contract; and provided that, after the possession date, Cendant Financial would "assume all benefits and burdens of ownership" in the home "until sale and transfer of title to a third party." However, Mrs. Hobson (who has a law license) determined that some of the contract's terms differed significantly from an ordinary real-estate contract. Among her objections were that the Hobsons were required to guarantee (rather than warrant to the best of their knowledge) the lack of material defects in the physical condition of the home; that Cendant had the choice to either pay off the Hobsons' mortgage or continue to service it; and that Cendant was permitted to rescind the sales contract if Mr. Hobson did not remain an employee of Entergy

or if Entergy failed to abide by the terms of its relocation–management agreement with Cendant.[2]

Mrs. Hobson sent detailed letters to Entergy explaining that Entergy had promised to buy their home and that the Cendant contract did not in fact constitute a purchase. Entergy reviewed Mrs. Hobson's correspondence but refused to alter the sales contract. As a result, the Hobsons did not enter into a sales contract with Cendant. The house remained unsold, and Mrs. Hobson and the children stayed in Rogers while Mr. Hobson continued to work for Entergy in central Arkansas. At some point, Mrs. Hobson returned to work for less money than she had previously made as an accountant. In mid–2005, Mr. Hobson submitted a letter of resignation to Entergy. The letter stated that Entergy had refused to honor its representations, made as part of its offer of employment, to purchase his house and relocate his family. It also stated that Hobson would have continued working for Entergy if Entergy had purchased his house. Upon resigning, Hobson returned to Rogers and accepted employment at an annual salary of approximately $19,000 less than he had been making at Entergy.

On September 15, 2006, the Hobsons sued Entergy based on Entergy's refusal to purchase their home.[3] They alleged that Mr. Hobson's acceptance of employment with Entergy was predicated on Entergy's agreement to purchase their home and that Entergy's

---

[2]See *Byrne, Inc. v. Ivy*, 367 Ark. 451, 241 S.W.3d 229 (2006), involving a similar contract.

[3]The Hobsons originally sued Entergy in 2003 but nonsuited the action in 2005. They refiled the case on September 15, 2006.

refusal to do so constituted a breach of contract. They further alleged that they relied to their detriment on Entergy's false promises and representations that it would purchase their home, for which Entergy should be liable on theories of promissory estoppel, actual fraud, and constructive fraud. Entergy denied the allegations.

On July 30, 2010, Entergy filed a motion for summary judgment directed to the Hobsons' claims for actual and constructive fraud. Entergy argued, in pertinent part, that the Hobsons' fraud claims should be dismissed because the claims were based on representations of future events rather than on misrepresentations of fact. Following a hearing, the circuit court granted Entergy's motion.

Thereafter, to support their claims on the remaining counts of breach of contract and promissory estoppel,[4] the Hobsons produced the report of an economics expert, Dr. Ralph Scott. Dr. Scott opined that the Hobsons had suffered approximately $3,000,000 in damages as the result of relinquishing their interest in kV Electric and Mrs. Hobson's giving up her job to prepare the Rogers house for sale. Based on this report, Entergy filed its second motion for summary judgment, arguing that Dr. Scott incorrectly employed a "but-for" measure of damages. According to Entergy, the proper measure of damages for breach of contract and promissory estoppel would have been to place the Hobsons in the same position as if Entergy's alleged promise had not been breached.

The Hobsons responded that their lost income was actually "consequential damage"

---

[4]The Hobsons' counsel indicated at one of the summary-judgment hearings that these counts were pled in the alternative.

and was, in any event, recoverable under their theory of promissory estoppel. The circuit court granted Entergy's motion for summary judgment but implied that it would consider other types of damages. Accordingly, the Hobsons gave notice that they would seek damages for repairs and improvements to the Rogers house; for Mr. Hobson's loss in taking a lower-paying job after leaving Entergy in 2005; and for Mr. Hobson's inability to participate in a retirement-buyout package that Entergy offered in October 2003.[5]

In response, Entergy filed its third motion for summary judgment, arguing again that the Hobsons' damages were not recoverable under their breach-of-contract or promissory-estoppel theories. The circuit court granted Entergy's motion in part, prohibiting Mr. Hobson's claim for reduced income after leaving Entergy. The court denied the motion as it related to the Hobsons' claim for home-improvement and repair expenses. It is not clear whether the court ruled on Mr. Hobson's claim for lost opportunity with regard to the retirement buyout.

At trial, the Hobsons sought damages of $27,285.98 for various repairs and improvements to their home. They offered testimony that some of the repairs and improvements were done to facilitate the sale of the home or at Cendant/Entergy's request. Other testimony indicated that the Hobsons benefited from some of the improvements or would have performed them regardless of the planned move. The jury returned a verdict in favor of the Hobsons for $21,935.98.

---

[5]Accepting the buyout would have required Mr. Hobson to release all claims against Entergy.



On appeal, the Hobsons challenge the summary-judgment order that dismissed their fraud claims and the two summary-judgment orders that limited their damages.

## II. *Standard of Review*

Summary judgment is to be granted by the trial court only when there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Killian v. Gibson*, 2012 Ark. App. 299, ___ S.W.3d ___. In reviewing a grant of summary judgment, we determine whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Id.* We view the evidence in the light most favorable to the party against whom the motion was filed and resolve all doubts and inferences against the moving party. *Id.* When a litigant cannot present proof of an essential element of their claim, the party moving for summary judgment is entitled to judgment as a matter of law. *Worley v. City of Jonesboro*, 2011 Ark. App. 594, 385 S.W.3d 908.

## III. *Actual and Constructive Fraud*

Actual fraud consists of the following elements: 1) the defendant made a false representation of material fact; 2) the defendant knew that the representation was false or that there was insufficient evidence upon which to make the representation; 3) the defendant intended to induce action or inaction by the plaintiff in reliance upon the representation; 4) the plaintiff justifiably relied on the representation; 5) the plaintiff suffered damage as a result of the false representation. *First Ark. Bank & Trust v. Gill Elrod Ragon Owen & Sherman, P.A.*, 2013 Ark. 159, ___ S.W.3d ___. Constructive fraud, as opposed to actual fraud, does not

include the elements of actual dishonesty or intent to deceive. *Born v. Hosto & Buchan, PLLC*, 2010 Ark. 292, 372 S.W.3d 324. It is defined as a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others. *Id.*

As described in their brief, the Hobsons' fraud claims are based on their allegations that Jerry Tanner's statements and Entergy's relocation policy falsely represented that Entergy would buy their home; that Entergy did not buy their home; that Entergy's intent was to induce Mr. Hobson to accept employment with the company; that Mr. Hobson justifiably relied on the misrepresentations; and that the Hobsons suffered damages as a result. On appeal, the Hobsons make arguments with regard to each of these allegations. Our focus, however, will be whether the Hobsons presented proof of one essential element of their claim: that Entergy made a misrepresentation of a material *fact*. Both actual and constructive fraud require proof of this element. *S. Cnty, Inc. v. First W. Loan Co.*, 315 Ark. 722, 871 S.W.2d 325 (1994); *Rice v. Ragsdale*, 104 Ark. App. 364, 292 S.W.3d 856 (2009). Further, because they claim fraud on the premise that Entergy induced Mr. Hobson to accept employment, the relevant statements for our purposes are those made by Jerry Tanner in seeking to hire Mr. Hobson.

At the trial level, Entergy moved for summary judgment on the ground that the misrepresentations cited by the Hobsons were promises of future events rather than statements of fact. It is well-established that representations that are promissory in nature, or of facts that will exist in the future, though false, will not support an action for fraud. *Anthony v. First Nat'l*

9

*Bank of Magnolia*, 244 Ark. 1015, 431 S.W.2d 267 (1968). In *P.A.M. Transport, Inc. v. Arkansas Blue Cross & Blue Shield*, 315 Ark. 234, 868 S.W.2d 33 (1993), our supreme court stated the following:

> One of the elements of deceit is that the misrepresentation alleged must typically be a misrepresentation of fact. In the context of negotiating a contract, a misrepresentation sufficient to form the basis of a deceit action may be made by one prospective party to another and must relate to a past event, or a present circumstance, but not a future event. "An assertion limited to a future event may be a promise that imposes liability for breach of contract or a mere prediction that does not, but it is not a misrepresentation as to that event."

315 Ark. at 240, 868 S.W.2d at 36 (citations omitted). Broken promises are therefore generally within the realm of breach–of–contract actions, and not fraud actions. *See S. Cnty, Inc.*, *supra*; *Chandler v. Kirkpatrick*, 270 Ark. 74, 603 S.W.2d 406 (1980); *Moore v. Keith Smith Co.*, 2009 Ark. App. 361.

Based on these authorities, we agree with Entergy that Tanner's statements were promises of future events rather than misrepresentations of fact, or statements of a present circumstance. Tanner made the representations regarding Entergy's relocation policy in a contractual setting, pertaining to something Entergy would do in the future. His alleged misrepresentations cannot be distinguished from other statements that our courts have held to be promises rather than misrepresentations of fact. *See S. Cnty, Inc.*, *supra* (holding that a bank's commitment to provide financing was a promise of future conduct made in a contractual setting and, therefore, not fraud); *Chandler*, *supra* (holding that a borrower's failure to pay a loan amount after promising his co-borrower he would do so was not fraud); *Moore*, *supra* (holding that a hen breeder's representation that he would continue to place flocks with

a farmer alluded to the breeder's policy and its future performance of a contract and was not fraud).

The Hobsons cite an exception to the "future events" rule, which is that fraud may be based on a promise of future conduct if the promisor, at the time of making the promise, has no intention to carry it out. *See Delta Sch. of Commerce, Inc. v. Wood*, 298 Ark. 195, 766 S.W.2d 424 (1989); *Stine v. Sanders*, 66 Ark. App. 49, 987 S.W.2d 289 (1999). However, the exception does not apply in this instance. The Hobsons produced no evidence that would permit an inference that Jerry Tanner lacked an honest belief about the promises he made to Mr. Hobson. Thus, there is no genuine issue of material fact on this point, and the general rule that promises of future conduct do not constitute fraud is not abrogated. *See generally Anthony v. First Nat'l Bank of Magnolia*, *supra*.

The Hobsons also argue that Entergy had a duty to disclose that its relocation policy would not involve the outright purchase of their home. Fraud-based liability for nondisclosure, as opposed to an affirmative misrepresentation, arises in special circumstances where there is a duty to communicate a concealed material fact or where one party knows another is relying on misinformation to his detriment. *Worley v. City of Jonesboro*, 2011 Ark. App. 594, 385 S.W.3d 908. Such liability may occur where the parties have a relation of trust and confidence or where there is inequality of condition and knowledge, or where there are other attendant circumstances. *Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc.*, 2011 Ark. App. 147, 382 S.W.3d 6.

To prevail in a case of fraudulent nondisclosure, the plaintiff must prove that the

11

defendant concealed a material fact known to it. *Downum v. Downum*, 101 Ark. App. 243, 274 S.W.3d 349 (2008). The Hobsons, however, produced nothing to show that Tanner concealed any material fact known to him with regard to Entergy's relocation. The only inferences supported by the proof are that Tanner told Hobson what he thought to be true and correct.

Based on the foregoing, we affirm the circuit court's grant of summary judgment on the Hobsons' fraud claims.

## IV. *Breach of Contract*

The Hobsons argue that the circuit court erred in its second and third summary-judgment orders that involved their claim of consequential damages for breach of contract.[6] The damage claims at issue are the Hobsons' lost earnings from relinquishing kV Electric; Mrs. Hobson's lost wages from giving up her employment at St. Mary's; Mr. Hobson's lost opportunity to participate in a retirement/severance package offered by Entergy; Mr. Hobson's reduced income after leaving Entergy in 2005; and certain costs incurred regarding an offer the Hobsons made on a home in Cabot, Arkansas.

The purpose of damages in a contract action is to place the injured party in the same position he would have been in had the contract been performed. Howard W. Brill, *Law of*

---

[6]The Hobsons' brief makes a cursory mention of their promissory-estoppel claim with regard to one of their elements of damage but otherwise makes no semblance of an argument that the court erred in dismissing that claim. Their argument on appeal focuses on the concept of consequential damages and the accompanying "tacit-agreement" rule that applies in a breach-of-contract case. We therefore analyze the Hobsons' argument on this point solely in terms of their contract cause of action.

SLIP OPINION

*Damages* § 17:1 (5th ed. 2004); *Acker Constr., LLC v. Tran*, 2012 Ark. App. 214, 396 S.W.3d 279. The law makes a distinction between the general damages suffered in a breach-of-contract case and consequential damages. General damages are those that necessarily flow from the breach. Brill, *supra* § 4:2. Consequential damages refer to damages that are only indirectly caused by the breach—instead of flowing directly from the breach, they result from some of the consequences of the breach. *Id.*; *Acker, supra.*

With regard to consequential damages, Arkansas follows the "tacit agreement" rule. This rule provides that, in order to recover consequential damages, the plaintiff must prove more than the defendant's mere knowledge that a breach of the contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility for such damages. *See Deck House, Inc. v. Link*, 98 Ark. App. 17, 249 S.W.3d 817 (2007).

In light of these standards, we conclude that the circuit court correctly ruled that three of the Hobsons' damage claims must fail as a matter of law. Their claim for lost earnings from the relinquishment of kV Electric was neither a direct nor an indirect consequence of Entergy's alleged breach of the alleged contract to buy the house. That is to say, the breach of the contract, if any, did not cause the loss of the business. Further, while there is evidence that Entergy knew that the Hobsons were giving up their business, a plaintiff seeking consequential damages must prove more than mere knowledge by the defendant that a breach will entail special damages. *Deck House, supra.* There must be some evidence that the defendant tacitly agreed to assume responsibility for such damages. *Id.* We see no proof from

which any inference may be drawn of a tacit agreement by Entergy to be responsible for the loss of business income in the event of a breach.

As for Mrs. Hobson's lost income from leaving her job, such damages are, at most, an indirect result of the alleged breach. However, the Hobsons have not made a convincing argument that Entergy committed to be bound for anything more than ordinary, direct damages in the event of a breach. *See Stift's Jewelers v. Oliver*, 284 Ark. 29, 678 S.W.2d 372 (1984); *Morrow v. First Nat'l Bank of Hot Springs*, 261 Ark. 568, 550 S.W.2d 429 (1977). As a result, Mrs. Hobson's lost income does not meet the definition of consequential damages, and no genuine issue of material fact remains on this point. Similarly, the Hobsons have not convinced us that Entergy arguably agreed, even tacitly, to be responsible for Mr. Hobson's special damages incurred in losing the opportunity to participate in Entergy's 2003 retirement buyout.

Finally, we turn to Mr. Hobson's claim that his reduction in income upon leaving Entergy's employment in 2005 was the result of Entergy's breaching its promise to buy the Hobsons' home. We agree with the Hobsons that a fact question remains on this point. According to Mr. Hobson's resignation letter, Entergy's failure to buy the house was the precise reason for his leaving to find another job. It is therefore arguable that these damages flowed directly, rather than indirectly, from the breach, in which case the tacit-agreement rule does not apply. *Acker Constr., LLC, supra*. Accordingly, we reverse and remand the summary judgment on this aspect of damages. *See generally Durham v. Smith*, 2010 Ark. App. 329, 374

14

S.W.3d 799.[7]

Affirmed in part; reversed and remanded in part.

HARRISON and WYNNE, JJ., agree.

*Gill A. Rogers*, for appellants.

*Quattlebaum, Grooms, Tull & Burrow PLLC*, by: *Charles L. Sclumberger*, for appellee.

---

[7]We do not address the Hobsons' argument that they were entitled to damages for certain costs associated with an offer made on a central Arkansas home. That claim was not pressed below nor did the circuit court rule on the matter.