2014 Ark. App. 154

**Roma TRAKRU, Appellant**

v.

**David MATHEWS, Appellee.**

**No. CV–13–619.**

Court of Appeals of Arkansas.

March 12, 2014.

Rehearing Denied April 16, 2014.

Quattlebaum, Brooms, Tull & Burrow, PLLC, Little Rock, by: E.B. Chiles IV, Joseph R. Falasco, and Jennifer Wethington Merritt, for appellant.

Wilcox & Lacy, PLC, Jonesboro, by: Tony L. Wilcox and Dustin H. Jones, for appellee.

ROBERT J. GLADWIN, Chief Judge.

|₁A Stone County jury awarded appellee David Mathews $570,000 in compensatory damages and $500,000 in punitive damages on his claims against appellant Roma Trakru for breach of contract, breach of fiduciary duty, and fraud. For reversal, Trakru argues that the circuit court erred in failing to grant her directed-verdict motion on each of Mathews's causes of action; in awarding Mathews attorney fees; in limiting cross-examination of Mathews; and in instructing the jury on fraud. We affirm.[1]

### I. Factual Background

David Mathews is the former owner of Stone County Ironworks (Ironworks), an iron-furniture design and manufacturing company headquartered in Mountain View, Arkansas.[2] |₂Under Mathews's ownership, the business enjoyed much success, with even greater growth projected at the turn of the twenty-first century. With growth came debt, however, and by 2002, Ironworks had approximately $5,000,000 in outstanding loans with Bank of America. The loans were collateralized by Ironworks's assets and personally guaranteed by Mathews.

In 2003, Ironworks defaulted on its loan payments, with approximately $4,600,000 due and owing. The bank engaged consultant Paul Porter to streamline Ironworks's operation and obtain financing elsewhere.

---

1. We previously dismissed this appeal for lack of finality. *Trakru v. Mathews*, 2011 Ark. App. 750, 2011 WL 6064994. The circuit court has now entered a final order that resolves all pending claims.

2. Mathews owned Ozark Mountain Enterprises, Inc., which did business as Stone County Ironworks.

When those efforts failed, Porter recommended that Ironworks be sold. He became the trustee of the company's assets through an assignment for the benefit of creditors and began looking for buyers. Mathews cooperated with Porter, for which Bank of America agreed to relieve him of his personal guarantee on the loans.

There was no shortage of interest in the company. Arkansas businessmen Sam Winstead and Tom Earnhart considered buying Ironworks, and appellant Roma Trakru of a California mergers-and-acquisitions company inquired about Ironworks on behalf of one of her clients. When Trakru learned that no brokerage commissions would be paid on the Ironworks sale, she ceased her inquiries as an agent and became interested in Ironworks personally.

Through mid–2003, Trakru and Mathews exchanged several phone calls and emails regarding a potential partnership in the iron furniture and decorating business. They contemplated that Mathews would provide the manufacturing skills for the enterprise while Trakru would provide her financial, technology, and management expertise. In a June 7, 2003 email, Trakru told Mathews that he would have stock options in the nascent company and that, if his investment matched hers, he would become a fifty-percent partner. Trakru also mentioned that Mathews would need to sign a non-compete agreement as part of the deal.

On June 8, 2003, Trakru drafted a Memorandum of Understanding (MOU) in which she and Mathews agreed to form a partnership. The MOU stated that they would be equal partners in the business; that Mathews would have a year to defer his investment in the company, after which his investment amount would increase by twenty-five percent each year; that each party would own a fifty-percent interest in the company at the end of three years or thereafter; that the agreement was valid until December 31, 2003, or until superceded by "another specific contract"; and that further details would be enumerated in a contract to be drawn up within two months. Mathews signed the MOU and returned it to Trakru. The MOU does not bear Trakru's signature, but Trakru told Mathews that she had signed the document.

Mathews and Trakru agreed to name their new company Metal Arts, Inc. Within a short period of time, Metal Arts became part of a plan in which Ironworks's assets would be purchased by three different buyers: Tom Earnhart and his business partner would buy Ironworks's Calico Rock industrial plant for $950,000; Sam Winstead would buy Ironworks's other tangible assets, such as real estate and equipment, for $750,000; and Mathews and Trakru, "or an entity in which one or more of them is an investor" would buy Ironworks's intangible assets, such as goodwill, trademarks, customer lists, and intellectual property, for $400,000. As part of these proposed transactions, all parties agreed that they would execute a mutual non-compete and non-solicitation agreement.

On the evening of July 1, 2003—approximately one week before the closing of the Ironworks sale—Trakru and Mathews executed a handwritten document during an evening at Sam Winstead's cabin. The document purported to give Mathews certain stock options in Metal Arts and provided as follows:

Whereas David Mathews and Roma Trakru entering into this agreement related to purchase of Stone County Ironworks on this 1st day of July 2003 by our signatures we agree as follows[:] David Mathews has a right to purchase up to 50% of Metal Arts, Inc. upon

payment of 50% of original price plus any other moneys invested in the Stone County Ironworks purchase and operation within the first one year minus any return of capital to Roma Trakru.

During subsequent years he can purchase an equity interest in Metal Arts, Inc. at valuation of 1.25 of original prior year's purchase price proportionate to the invested capital of Roma Trakru.

As and when David Mathews invests his 50% of invested capital in Metal Arts, Inc. Roma Trakru will assign that proportionate % of stock in Metal Arts, Inc. to David Mathews.

Invested capital is amount of money used for purchase + amount invested available cash. Available cash is available to Roma Trakru to withdraw from the company and will not be included as part of invested capital. [signed by Mathews and Trakru; witnessed by Winstead and Earnhart].

According to Mathews, he insisted on executing the above "stock-option agreement" because he was worried that, with the Ironworks sale approaching, his partnership agreement with Trakru was unclear and that, under the terms of the pending sale, he would be required to sign a non-compete agreement that would render him unable to participate in the iron-working business.

Mathews did not exercise his option to buy into Metal Arts before the sale of Ironworks's assets on July 9, 2003. Consequently, Trakru, through Metal Arts, became the sole owner of Ironworks's intangible assets on that date. Mathews relinquished all of his Ironworks assets on July 9 and, by virtue of the covenant not to compete that he signed at closing, was prohibited from working in the iron-furniture business.

Within days after closing, Trakru's attitude toward Mathews changed drastically, and she informed him that they could not work together. Trakru explained later that she felt wrong about the partnership for various reasons, including that Mathews had spoken harshly to her and that Mathews's employees allegedly said that they did not want to work for him. When Mathews indicated to Trakru that he wanted to exercise his option on Metal Arts, Trakru offered to sell him the company for approximately $580,000, which, according to her, was $50,000 more than she had invested.[3] Mathews began trying to put together a financing package but encountered difficulty getting in touch with Trakru.

Mathews later notified Trakru that he wanted out of the covenant not to compete. Trakru's attorney responded that the covenant not to compete remained enforceable. In August 2003, Mathews requested an accounting from Trakru "to determine the purchase price should Mr. Mathews elect to exercise his option to purchase 50% of Metal Arts, Inc." Trakru's attorney responded that the option did not exist. No further information was forthcoming from Trakru.

Mathews eventually learned that Trakru had paid herself $300,000 in consulting fees from the amount she invested in Metal Arts and that she had sold Metal Arts for $640,000 within a few weeks after the July 9, 2003 closing. On August 6, 2003, Trakru and a man named Paul Balentine formed a company called Metal Creations, Inc., and that company purchased Metal Arts on or about August 22, 2003. Later, Balentine paid Trakru $550,000 for her interest in Metal Creations. Mathews re-

---

3. In addition to the $400,000 stated price of Ironworks's intangible assets, Trakru claimed to owe Winstead and Earnhart another $130,000 as part of the asset sales.

ceived none of the proceeds from these transactions.

On January 20, 2004, Mathews sued Trakru and Metal Arts in Stone County Circuit Court for fraud, breach of contract, and breach of fiduciary duty, based on the above-mentioned events.[4] Following a trial, the jury found Trakru liable on all three causes of action and awarded Mathews $570,000 in compensatory damages without allocating that amount to any particular cause of action. The jurors also awarded Mathews $500,000 in punitive damages, having been instructed that they could do so in connection with the fraud claim. The circuit court entered judgment accordingly and granted Mathews $53,500 in attorney fees based on the breach-of-contract verdict.

## II.  *Denial of Directed Verdict*

Trakru argues first that the circuit court erred in denying her motion for a directed verdict, which she made at the close of Mathews's case and at the close of all of the evidence. The motion was directed to all three of Mathews's causes of action and, with Mathews's agreement, incorporated arguments made by Trakru in several pretrial motions.

In reviewing the denial of a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *Jenkins v. APS Ins., LLC,* 2013 Ark. App. 746, 431 S.W.3d 356. We do not try the issues of fact on appeal but simply review the record for substantial evidence to support the jury's verdict. *Id.* Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* We view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

### A.  Breach of Contract

Mathews's breach-of-contract claim arose from the handwritten "stock-option" agreement that Mathews and Trakru signed at Winstead's cabin on July 1, 2003. An option contract is an agreement that consists of an offer by one person to sell something within a limited time and an accompanying right by the other person to accept or reject the offer within that time. *See Roetzel v. Coleman,* 2010 Ark. App. 206, 374 S.W.3d 166. As parties to the unilateral contract, the optionor is bound while the optionee is free to accept or reject the offer. 1 Richard A. Lord, *Williston on Contracts* § 5:16 (4th ed.2007); *Swift v. Erwin,* 104 Ark. 459, 148 S.W. 267 (1912). During the time in which the optionee can exercise his option, the optionor cannot act in derogation of the option offer. *Williston on Contracts, supra.* In this case, Mathews alleged that the option agreement was breached when Trakru sold Metal Arts before he was allowed to exercise his option.

We begin with Trakru's claim that the handwritten option did not contain definite terms sufficient to create a contract. Before a contract may be enforceable, it must be definite and certain in its terms. *Kinkead v. Estate of Kinkead,* 51 Ark.App. 159, 912 S.W.2d 442 (1995). The writing in this case was sufficiently definite to comprise an option contract. It provided that Mathews had a right to purchase an interest in Metal Arts at a formulaic price within one year and at a different price in subsequent years.

Trakru also argues that the option contract lacked mutuality because it did not require anything of Mathews. Mu-

4.  Mathews pled additional causes of action that are not at issue on appeal.

tuality of contract means that there must be an obligation by each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound. *See Essential Accounting Sys., Inc. v. Dewberry*, 2013 Ark. App. 388, 428 S.W.3d 613. However, lack of mutuality is not an impediment to the parties' option contract. As just explained, a unilateral option contract by nature lacks mutuality—the optionor is bound to her offer while the optionee is free to accept or reject it. *Williston on Contracts, supra.* As long as there is consideration, a unilateral option contract does not require mutuality. *Id.*

This leads to Trakru's next argument, which is that the option contract was not supported by consideration. Consideration is any benefit conferred or agreed to be conferred upon a promisor to which he is not lawfully entitled, or any prejudice suffered or agreed to be suffered by a promisee, other than that which he is lawfully bound to suffer. *Landmark Savings Bank v. Weaver–Bailey Contractors, Inc.*, 22 Ark.App. 258, 739 S.W.2d 166 (1987). Trakru claims that consideration was lacking in this case because Mathews gave nothing in return for the option.

We disagree. Mathews explains that, in exchange for Trakru's promise of an option to invest in Metal Arts, he executed the asset-purchase and non-compete agreements of which Trakru was a beneficiary. He testified that he would not have signed those agreements without the promise of the partnership with Trakru. Although, as Trakru points out, there was evidence to the contrary, it was the jury's prerogative to resolve conflicts in the evidence. *See generally Lindsey v. Watts*, 273 Ark. 478, 621 S.W.2d 679 (1981). Viewing the proof in the light most favorable to Mathews, there was substantial evidence that Math-

ews conferred a benefit on Trakru in exchange for the option to invest in Metal Arts, Inc.

Trakru contends, however, that no consideration flowed to her because the non-compete agreement was signed for the benefit of the other asset purchasers. Her contention is contradicted by the evidence. Trakru asked Mathews to sign a non-compete early on in her communications with him, and she attempted to enforce the covenant not to compete in a counterclaim she filed against Mathews in this lawsuit.

Trakru argues further that part of Mathews's purported consideration—signing the covenant not to compete—was illusory because he viewed the covenant as unenforceable. On this point, Trakru references several emails in which Mathews and his attorneys discussed an overly broad and possibly unenforceable covenant not to compete. According to Mathews, those conversations concerned a different covenant, and his claim is supported by the documentary proof. In any event, Mathews and his lawyers acknowledged that whatever covenant they were discussing could prove enforceable.

Trakru also asserts that Mathews's July 9, 2003 signatures at the Ironworks closing could not serve as consideration for the July 1, 2003 option contract. Arkansas law does require "contemporaneous" consideration, but we apply this rule to prohibit *past* matters from serving as consideration for a current promise. *See Simmons v. Simmons*, 98 Ark.App. 12, 249 S.W.3d 843 (2007). Here, Mathews's signatures on the asset-purchase and non-compete agreements were given a few days *after* Trakru's promise and were given as part of a related set of contracts. We therefore find no merit in this argument or other possible arguments raised by Trakru with regard to lack of consideration.

■ Trakru's remaining arguments regarding the breach-of-contract verdict have not been preserved for appellate review. A motion for a directed verdict shall state the specific grounds therefor. Ark. R. Civ. P. 50(a) (2013). The requirement that specific grounds be stated is especially necessary when a case involves multiple issues, as this one does. *Advanced Envtl. Recycling Techs., Inc. v. Advanced Control Solutions, Inc.*, 372 Ark. 286, 275 S.W.3d 162 (2008). Further, a party is bound by the course and scope of the arguments made in her directed-verdict motion. *Boellner v. Clinical Study Ctrs., LLC*, 2011 Ark. 83, 378 S.W.3d 745.[5]

## B. Fraud

Trakru offers several reasons why the jury's fraud verdict was not supported by substantial evidence. As in the immediately preceding discussion, some of the assignments of error are not preserved for review. Others rely on Trakru's breach-of-contract arguments previously rejected. Consequently, we reach only the following arguments.

■ Trakru first contends that any misrepresentations made to Mathews regarding his option to buy into Metal Arts were based on promises of future conduct and were therefore not actionable as fraud. Fraud requires, among other things, proof of a false representation of material fact. *First Ark. Bank & Trust v. Gill Elrod Ragon Owen & Sherman, P.A.*, 2013 Ark. 159, 427 S.W.3d 47. Representations that are promissory in nature, or of facts that will exist in the future, do not support an action for fraud. *P.A.M. Transp., Inc. v. Ark. Blue Cross & Blue Shield*, 315 Ark. 234, 868 S.W.2d 33 (1993).

■ We see no reversible error on this point. Even if Trakru is correct that her representations to Mathews were promissory in nature, an exception to the "future events" rule arises if the promisor, at the time of making the promise, has no intention to carry it out. *Delta Sch. of Commerce v. Wood*, 298 Ark. 195, 766 S.W.2d 424 (1989); *Hobson v. Entergy Ark., Inc.*, 2014 Ark. App. 101, 432 S.W.3d 117; *Stine v. Sanders*, 66 Ark.App. 49, 987 S.W.2d 289 (1999). Here, substantial evidence supports a finding that Trakru made a false promise knowing at the time that it would not be kept. Upon acquiring Ironworks's intangible assets on behalf of Metal Arts, she immediately rejected Mathews as a partner in Metal Arts and quickly put the company on the market, despite having promised Mathews an option to invest in the company just days earlier. Trakru's intent in so acting was a question of fact. *Stine, supra.* The jury may well have interpreted her behavior to mean that she did not intend to honor the option contract when it was made.

■ Trakru also argues that any misrepresentation she made to Mathews regarding his option to invest in Metal Arts was not material. A matter is material if it is significant or affects a person's decision-making. *See Black's Law Dictionary* 1066 (9th ed.2009). Clearly the option rights were significant to Mathews. As already discussed, Mathews testified that Trakru's representations regarding the option agreement were critical in his decision to go forward with the asset-purchase agreements and the covenant not to compete.

Trakru further claims that she made no misrepresentation because she did what

---

5. To the extent that Trakru raised certain arguments in a posttrial motion, those arguments are barred if they were not previously raised in her directed-verdict motion. *Boellner, supra.*

she promised she would do: offered to let Mathews buy into the company. Trakru is referring to her offer to let Mathews buy her out for $580,000. That, however, was not what the option agreement provided. Mathews's option was to buy up to half of Metal Arts. Further, he needed an accounting to compute the amount of his buy-in but could not obtain the necessary information from Trakru. Trakru also cites a letter sent by her lawyer to Mathews on February 3, 2004—not long after suit was filed in this case—asking Mathews if he stood ready, willing, and able to purchase an interest in Metal Arts. By that point, however, Trakru had shut down Metal Arts and sold all of its assets.

Additionally, Trakru contends that Mathews did not reasonably rely on any misrepresentations to his detriment. She echoes her earlier argument that Mathews did not rely on her representations in deciding to sign the asset purchase agreements or the covenant not to compete. As stated earlier, Mathews testified that he needed the option agreement to feel protected in signing the asset-purchase agreements and the non-compete agreement. Trakru maintains that Mathews was required to sign those agreements regardless of any representations she might have made. Whether Mathews's refusal to sign the agreements would have been prudent, he did have the choice of signing or not signing them.

### C. Damages

Trakru argues several specific reasons why Mathews's causes of action must fail due to lack of proof of damages. At trial, Trakru argued generally that there was no substantial evidence of damages. But, she did not articulate the specific arguments

that she now makes on appeal with regard to damages. We therefore do not reach her arguments. *See Stacks v. Jones,* 323 Ark. 643, 916 S.W.2d 120 (1996); *Mine Creek Contractors, Inc. v. Grandstaff,* 300 Ark. 516, 780 S.W.2d 543 (1989). We note that, in any event, the proof supports Mathews's claim for damages on both the contract and fraud theories.

We therefore affirm the jury's verdict against Trakru for breach of contract and fraud. Having done so, we affirm the award of attorney's fees to Mathews on the ground that his action was primarily based in contract. Ark.Code Ann. § 16–22–308 (Repl.1999). We also affirm the punitive-damage award in conjunction with the fraud verdict.[6]

Our holding makes it unnecessary for us to reach Trakru's arguments regarding the verdict for breach of fiduciary duty. *See S. Beach Beverage Co. v. Harris Brands, Inc.,* 355 Ark. 347, 138 S.W.3d 102 (2003).

### IV. *Limitation of Cross–Examination*

During voir dire, it was established that a potential juror, Karen Bernstein, was a former Ironworks employee. Bernstein was asked if she knew anything about the case, and she responded that she did not. She was not chosen to sit on the jury.

While Mathews was on the stand during his case-in-chief, Trakru wished to cross-examine him about Bernstein's likely knowledge of the case, in contrast to her statements during voir dire. The court did not allow the cross-examination in the presence of the jury, citing Ark. R. Evid. 403 (2013).

---

6. Trakru does not challenge the amount of the attorney-fee award or the punitive-damage award, nor does she make an argument re-garding an election of remedies between the contract and tort causes of action.

We will not reverse on an evidentiary issue in the absence of a manifest abuse of discretion by the circuit court. *Eft v. Rogers,* 2012 Ark. App. 632, 425 S.W.3d 1. Here, the court cited Rule 403, which permits the exclusion of relevant evidence that is, among other things, more unfairly prejudicial than probative, confusing, or involves undue delay and a waste of time. We see no manifest abuse of discretion in the court's limitation of Mathews's testimony regarding a matter that was tangential to the proceedings and bore no significant probative value.

## V. *Jury Instruction*

The court instructed the jury on the elements of fraud and also gave the following instruction:

> A plaintiff may establish deceit by submitting proof that a defendant made a false promise knowing at the time that it was made that it would not be kept.

Trakru argues that this instruction was misleading because it appeared to recite the sole element of fraud.

We conclude that Trakru did not preserve this issue for appeal. The record reflects only a general objection to the instruction. No party shall assign as an error the giving of an instruction unless he objects thereto, stating distinctly the matter to which he objects and the grounds of his objection. Ark. R. Civ. P. 51; *Agracat, Inc. v. AFS–NWA, LLC,* 2012 Ark. App. 372, 2012 WL 1943334. The party must tell the court why the instruction is wrong. *Agracat, supra.* Trakru did not meet this standard.

Trakru argues, however, that no objection was necessary because the instruction was inherently erroneous. An inherently erroneous instruction excuses a specific objection when the instruction is binding. *See Agracat, supra.* A binding instruction tells the jury that, if the conditions asserted in the instruction are found to exist, the jury will return a verdict based on the instruction. *See id.* The instruction at issue did not tell the jury to return a verdict and, therefore, was not binding. Consequently, a specific objection was required to challenge the instruction.

Trakru also claims that the circuit court failed to make a record of two hearings on jury instructions. The record reflects that the circuit court gave Trakru the opportunity to place the basis for her objections to jury instructions on the record. She did so with regard to some instructions, but not the one at issue. Further, as Mathews points out, this case returned to circuit court for the purpose of obtaining a final order and remained there for a long period of time. If Trakru had desired to recreate a record, she had every opportunity to do so, but did not.

## VI. *Motion to Dismiss*

Pending before us is Mathews's motion to dismiss Trakru's appeal based on Trakru's alleged delay in obtaining a final order from the circuit court following our 2011 opinion in *Trakru v. Mathews,* 2011 Ark. App. 750, 2011 WL 6064994. We deny the motion.

## VI. *Conclusion*

The judgment against appellant Roma Trakru is affirmed in all respects. Mathews's motion to dismiss is denied.

Affirmed; motion to dismiss denied.

VAUGHT and HIXSON, JJ., agree.